Marshall R. PETERSON, Appellant,

v.

UNITED STATES of America, Appellee.

No. 14307.

United States Court of Appeals Ninth Circuit.

June 27, 1955.

Nels Peterson, Frank H. Pozzi, Berkeley Lent, Portland, Or., for appellant.

C. E. Luckey, U. S. Atty., Victor E. Harr, Asst. U. S. Atty., Portland, Or. (Gray & Lister, Portland, Or., of counsel), for appellee.

Before HEALY, ORR and CHAMBERS, Circuit Judges.

ORR, Circuit Judge.

Appellant, a seaman, brought a proceeding under the Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq., claiming damages for injuries alleged to have been sustained on a ship owned and operated by appellee, and caused by the unseaworthiness of the vessel and negligence imputable to appellee.

The trial court denied relief to appellant and made findings of fact. This appeal in large measure presents questions of fact which the trial court has found in favor of appellee and, there being present in the record substantial evidence to support the findings, we have no other alternative than to sustain the judgment.

It is urged that we should determine the facts for ourselves under a theory of trial de novo. That theory has recently been laid to rest by the Supreme Court of the United States in the case of McAllister v. United States, 1954, 348 U.S. 19, 20, 75 S.Ct. 6, 8. The Supreme Court said: "No greater scope of review is exercised by the appellate tribunals in admiralty cases than they exercise under Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A."

The facts disclose that appellant was employed as a second cook and baker aboard a vessel carrying wheat to India. Shortly after the start of the vessel's return voyage to the United States, appellant complained of an earache. Two days after this complaint, on October 11, 1951, the ship put in at Penang, Malaya, to procure medical attention for another crew member. During this stop appellant was examined by a shoreside doctor who advised that he be given a "shot" of

penicillin and, during the same day, a "shot" was administered by the chief mate. Sometime later appellant developed a rash which may or may not have been a penicillin reaction. On October 13th the vessel put in at Pulosambo, across the straits from Singapore, for the purpose of taking on fuel. At that time appellant was not feeling well but had not asked to be relieved from work. The evidence is conflicting as to whether appellant, during the time the ship was in Pulosambo, requested that he be given an opportunity to consult a doctor. He did not, in any event, consult a doctor while at Pulosambo. On October 15th appellant was relieved from work and the master undertook to provide treatment for a physical condition which appeared to be a penicillin rash. The rash did not respond to the treatment given and on October 17th the master radioed the director of quarantine at Manila for medical instructions which were received and carried out. From October 18th to 22nd appellant's condition appeared to be improving. On October 22nd his condition worsened and it was determined that he should be removed from the vessel, and he was provided air transportation to Okinawa the following day. During his hospitalization in Okinawa appellant suffered an internal hemorrhage and became critically ill. He recovered from the acute stage, but developed an incurable kidney disease known as chronic glomeronephritis which in turn resulted in a potentially dangerous heart condition.

Appellant claims that the ship was rendered unseaworthy by a high incidence of contagious skin disease among the crew and that his injuries resulted from such unseaworthiness. Appellant also alleges that his injuries were caused by the negligence of appellee's agents. He charges negligence in that appellee's agents failed to isolate diseased crew members, administered penicillin without medical supervision, failed to provide medical attention at Pulosambo, and did not sail out of course in order to hospitalize him at Manila.

In support of his claim of unseaworthiness appellant relies upon the case of Boudoin v. Lykes Bros. Steamship Co., 1955, 348 U.S. 336, 75 S.Ct. 382. There it was held in the case of an assault by a seaman found to be a "person of dangerous propensities and proclivities" that the warranty of seaworthiness extends to the crew as well as the ship and that the owner warrants that the crew, although not necessarily "competent to meet all contingencies" is "equal in disposition and seamanship to the ordinary men in the calling". See Keen v. Overseas Tankship Corp., 2 Cir., 1952, 194 F.2d 515, 518. In the instant case, even though the warranty of seaworthiness extended to the crew, the trial court found the ship not to be unseaworthy, and that finding is supported by substantial evidence. This evidence discloses that the incidence of disease and the danger of infection aboard the ship claimed to be unseaworthy was in no way unusual or out of the ordinary.

Appellant calls the vessel a "scurvy ship". We take this expression to mean a ship in which contagious disease is present to an extent which makes the vessel unequal to an ordinary ship in the calling. In addition to appellant four members of a crew of forty had skin conditions of greater or lesser severity. The condition of only one was such as to warrant his being placed in the ship's hospital. The afflictions of the seamen were contagious only in the sense that they could be spread by direct contact and not in the sense in which what are usually regarded as infectious or communicable diseases are contagious. Creditable testimony appears in the record to the effect that such an incidence of skin disease was not unusual, especially when a ship sails in tropical waters. The trial court also stated that it was unable to relate appellant's illness to the ailments of the other crew members. This conclusion, based on competent medical testimony, in itself warrants denial of the claim based on unseaworthiness.

It is charged that the master of the vessel was negligent in failing to

isolate the three members of the crew who, in addition to the one who was isolated, suffered from skin diseases. These men do not appear to have been seriously ill or to have had diseases which even in the light of subsequent events, would seem to have required their isolation. The ship was cleared for quarantine at Singapore when medical personnel at Penang, Malaya, found that the man previously isolated did not in fact have a communicable disease. The trial court's determination that no causal connection was shown between appellant's injuries and the infections of the other crew members also precludes recovery based upon negligence in this respect.

The claimed negligent act of administration of penicillin to appellant at Penang, without the presence of a doctor, has no merit. The "shot" was given on the advice of a physician and it nowhere appears that it would have been administered in a different manner had a doctor been present.

■ Negligence also is claimed in the failure to hospitalize appellant or obtain the services of a doctor for him when the ship put in to Pulosambo. As hereinbefore stated some conflict appears as to whether appellant asked to see a doctor at Pulosambo. During that time appellant was performing his duties and had not requested to be relieved from work. It does not appear that his condition was such as would apprise a reasonable man that hospitalization or the services of a physician was then necessary. Medical facilities were not available at Pulosambo, but were available at Singapore, across the straits. Political unrest prevailing at the time made it difficult to cross from Pulosambo to Singapore and it was reasonable from all the circumstances to conclude that no such health emergency existed as to require the surmounting of the existing difficulties in order to afford an opportunity to appellant to consult a doctor.

On the question of the alleged negligence of the master in failing on October 17th to alter his course so as to put appellant ashore at Manila, the trial court found adversely to appellant. His condition on October 17th was not such as to make apparent to a reasonable man that he should be immediately hospitalized. The captain did take immediate and reasonable steps to ascertain the course of action best suited to safeguard appellant's health. He radioed for and received medical instructions from Manila and was advised not to consider landing the patient there. It was typhoon season, the ship was light and high in the water, having discharged its cargo of wheat in India. There was some danger involved in a detour of two or three days to reach Manila. That the captain did have the welfare of appellant in mind is further evidenced by the fact that on the 23rd day of October appellant, pursuant to arrangements made by the captain, was flown to Okinawa and hospitalized.

■ Appellant was paid maintenance up to but not beyond August 4, 1952, at which time he was declared fit for duty by the United States Public Health Service. He claims additional maintenance to the time of trial. In the case of Calmar Steamship Corp. v. Taylor, 1928, 303 U.S. 525, 530, 58 S.Ct. 651, 654, 82 L.Ed. 993, the Supreme Court of the United States laid down the rule governing the period during which a seaman having an incurable disease is entitled to maintenance. The court there stated: "We can find no basis for saying that, if the disease proves to be incurable, the duty extends beyond a fair time after the voyage in which to effect such improvement in the seaman's condition as reasonably may be expected to result from nursing, care, and medical treatment. This would satisfy such demands of policy as underlie the imposition of the obligation." In the instant case competent medical men testified that although appellant required and would require continued medical observation after August 4, 1952 no improvement in his condition could be expected. This supports the conclusion that no additional maintenance should be allowed.

Judgment affirmed.