James F. DOBBS

v.

LYKES BROTHERS STEAMSHIP CO., Inc.

No. 2593.

United States District Court
E. D. Louisiana, New Orleans Division.
March 20, 1956.

Raymond H. Kierr, Samuel C. Gainsburgh, New Orleans, La., for libelant.

Terriberry, Young, Rault & Carroll, Andrew R. Martinez, Edward S. Bagley, New Orleans, La., for respondent.

CHRISTENBERRY, Chief Judge.

The above entitled cause having come on for hearing on the pleadings and proof of the respective parties, and having been argued by respective counsel, the Court being fully informed in the premises, after due deliberation makes the following findings of fact and conclusions of law.

### Findings of Fact.

#### I.

The respondent is a Louisiana corporation with its offices in New Orleans, and was and still is the owner and operator of the S. S. Genevieve Lykes.

#### II.

The libelant, a merchant seaman, was chief electrician aboard the S. S. Genevieve Lykes for one or more voyages prior to July 24, 1953.

#### III.

On July 24, 1953, the libelant was admitted to the United States Public Health Service Hospital at New Orleans (hereinafter referred to as the marine hospital), for a kidney ailment which was diagnosed as chronic glomerulonephritis (nephrotic stage).

#### IV.

The libelant remained an inpatient at the marine hospital until January 7, 1954.

## V.

While under treatment at the marine hospital, the libelant was seen in consultation by three specialists in internal medicine, each of whom was, either at the time of the consultation or at the time of the trial, the head of the department of internal medicine at the medical school of a major university. These consultations commenced within four days after his admission and continued to the time of his discharge.

## VI.

The physician who was the medical resident in direct charge of the libelant's case at the marine hospital, Dr. Everett C. Sutter, testified on the trial in a completely objective and very impressive fashion.

## VII.

The entire course of the libelant's treatment was followed in minute detail by Dr. Sutter. He prepared five large charts, several feet in length and width, upon which he plotted graphically the daily course of the libelant's illness as reflected in the many tests and examinations conducted on the libelant. The charts were prepared largely to reassure the libelant and his mother as to his recovery and also served as an aid to Dr. Sutter and the consultants. The charts are noted as concrete examples of the extraordinary care which the libelant received at the marine hospital.

## VIII.

The libelant, through the two private consultants afforded to him by the U. S. Public Health Service as well as through Dr. Edgar Hull, who was called at the instance of his mother, had access to laboratory facilities and diagnostic techniques which would not have been available to a private patient. These extraordinary facilities, maintained by the university medical schools, were available to and were used by his consultants who had access to them by reason of their positions on the medical school faculties. This again demonstrates the unusual character of the treatment afforded the libelant at the marine hospital, all of which was unqualifiedly approved by Dr. Hull.

## IX.

The libelant and his mother both took the witness stand. Their demeanor while testifying, the conflicting stories related by them, and the wholly incomprehensible nature of some of their testimony, forced the court to conclude that the testimony given by them was not accurate and could not be relied upon.

## X.

The libelant and his mother apparently have a "mother-son" relationship which results in a greatly over-solicitous attitude on the part of the mother and the complete dependence of the son upon the mother. This was manifest on the trial of this cause, even to a layman, and is borne out by the psychiatric reports in the marine hospital record. This relationship plainly appears to have been the cause of the libelant's dissatisfaction with his treatment at the marine hospital.

## XI.

Early in his hospitalization the libelant's mother came to New Orleans from Arizona and her constant attendance upon her son had such an adverse effect on his recuperation that the medical staff and psychiatric consultants at the hospital found it necessary to take steps to reduce this contact. The libelant was removed from the seriously ill list so that he would be allowed to have visitors only during regular visiting hours, but this was not satisfactory and he was later transferred to, and allowed to remain in, the psychiatric ward where visitors were not allowed.

## XII.

One of the effects of the "mother-son" relationship, as noted by the doctors at the marine hospital, was the exaggeration of his symptoms by the libelant. Thus, although he would actually get up and walk to the cafeteria for recreation, he could not, at the same time, support himself while being examined by his physicians.

### XIII.

On January 7, 1954, the libelant was discharged from inpatient status at the marine hospital to outpatient status, with the following notation on his record:

"It is felt at this time that the patient is physically fit to return to duty, but because of the marked weakness which continues, he was discharged not fit for duty with determination of fitness for duty to be made as an outpatient. * * * It is our opinion that the patient should be returned to duty as soon as feasible because of the mother-son relationship."

### XIV.

The decision to discharge the libelant to outpatient status was made by the medical staff at a consultation held several weeks prior to his discharge. The libelant and his mother both testified to a wholly incredible conversation on January 7, 1954, with Dr. Sutter, wherein the latter advised them that he was to discharge the libelant as fit for duty on that day. This narration was positively refuted by the discharge given to the libelant.

### XV.

On the Thursday when libelant was discharged as an inpatient (January 7, 1954), he was given a return appointment slip, whereunder he was to receive his first outpatient checkup on the following Monday, (January 11, 1954). As reflected in the note of January 7, it was contemplated that Dobbs should remain on outpatient status until he regained sufficient strength and self-assurance to be returned to duty. At the same time, it was felt that an early return to duty was advisable in the light of the "mother-son" relationship. The libelant, however, under the influence of his mother, was dissatisfied with the treatment he had received at the marine hospital, and had no intention of continuing his treatment there.

### XVI.

On the day of his discharge from inpatient status at the marine hospital, Thursday, January 7, 1954, the libelant made an appointment to see and did see the urologist at a private clinic in the City of New Orleans. The urologist advised him that his complaint was within the field of a specialist in internal medicine, such as he had been treated by during the entire course of his hospitalization at marine hospital. He was then advised that there were no open appointments to see the clinic's internist for that day, and accordingly returned home.

### XVII.

On the following day, Friday, January 8, 1954, the libelant, in company with his mother, went to the Veteran's Administration Regional Office in New Orleans, where his mother executed an application for hospitalization on his behalf. The application was referred to a Veteran's Administration physician, whose report states:

"Brief History: Patient discharged at marine hospital yesterday with diagnosis of chronic glomerulonephritis (nephrotic stage).

"Has numerous complaints about hospitalization there. Blames many of signs and symptoms in natural course of disease upon treatment, etc. received.

*　　*　　*　　*　　*

"History and PE (physical examination) indicate no reason for hospitalization at present. Patient in no distress from renal disease."

The report concluded by prescribing "back to marine hospital clinic as scheduled".

### XVIII.

The libelant's mother then telephoned Dr. Hull and requested that he refer her to a private physician who might undertake the treatment of the libelant. Dr. Hull furnished her with the name of Dr. Benjamin O. Morrison, whom the libelant went to see on the following day, Saturday, January 9, 1954. Dr. Morrison gave the libelant an examination in his office and checked the albumin in the libelant's urine. The latter test gave a 4 plus determination, which Dr. Morrison

appeared to regard as very serious, and which apparently was the ultimate reason for his hospitalization of the libelant on Monday, January 11, 1954. The testimony of Dr. Hull revealed that a single test of this nature would not be significant, and would merely indicate a need for future observation. The court accepts the latter interpretation of this test as correct. The lack of significance in the albumin test is further borne out by the fact that on a subsequent hospitalization at Mercy Hospital in New Orleans, from October 18 to 20, 1954, Dr. Morrison discharged the libelant although he had 4 plus albumin in his urine during the entire course of his hospitalization, including the day of discharge.

### XIX.

The libelant on his initial visit to Dr. Morrison told the latter that he was dissatisfied with his treatment at the marine hospital and wished to obtain private treatment from Dr. Morrison. The doctor in turn told libelant that he could not undertake his treatment while he was receiving concurrent treatment at the marine hospital. This was the logical consequence of the fact that no patient can be treated simultaneously by two physicians or sets of physicians operating independently of each other.

### XX.

At the time of his visit to Dr. Morrison on Saturday, January 9, 1954, the libelant had an outpatient appointment slip from the marine hospital which provided for a return visit to that institution on Monday, January 11, 1954. The libelant testified that Dr. Sutter had told him that he was to discharge him as fit for duty at the latter time. This is not correct; Dr. Sutter testified to the contrary, so, in effect, did Dr. Morrison, and the record clearly shows that the libelant at all times realized that he was to continue to receive care at the marine hospital.

### XXI.

The parties agreed on the trial of this cause that the respondent was willing to pay the maintenance due the libelant during the period of outpatient care at the marine hospital, viz.: January 7 to 11, 1954, and the respondent has deposited the maintenance for this period in the registry of the court since the time of the trial, together with a sum sufficient to include the libelant's costs. The only issue accordingly is the maintenance and medical expenses which libelant claims for the period subsequent to January 11, 1954.

### XXII.

The libelant returned to the marine hospital for his first outpatient appointment as scheduled on Monday, January 11, 1954. He then undertook to procure his discharge from the marine hospital. He told Dr. Sutter who examined him that:

(a) He desired a fit for duty slip.

(b) He felt good except for residual weakness.

(c) He wished to go to San Francisco and would procure any further medical care which he might require at the United States Public Health Service Hospital there.

(d) He needed a fit for duty slip to "clear with his union".

### XXIII.

As the name implies, the libelant's illness is a chronic one, but it may entirely disappear by a spontaneous remission. The reason for such a disappearance is unknown to medical science, and is unrelated to any treatments presently available. During the course of the disease its patients will suffer "attacks" in the sense that the chronic disease will flare up into an acute or sub-acute stage.

### XXIV.

The libelant at the time of his discharge from the marine hospital had received all the improvement in his condition that could reasonably be expected to result from nursing, care and medical treatment; he had received the maximum benefits available from such nursing, care and medical treatment. This is true despite the fact that the marine

hospital would have continued to follow the libelant on outpatient status in the absence of his request for a discharge. He was cured as far as possible, and could return to a gainful occupation although the need for continued observation probably would prevent his returning to sea.

## XXV.

The fit for duty slip given to the libelant by Dr. Sutter was issued for the reason stated in the outpatient note prepared by the doctor at that time. This states:

"Now feels good except for residual weakness. Desires F.F.D. (fit for duty) slip. F.F.D. (fit for duty) slip given."

As noted, the fit for duty slip was given because it was requested by Dobbs. The hospital, obviously, could not force the libelant to accept its services where he was unwilling to do so.

## XXVI.

Dr. Sutter believed that the libelant's transfer to San Francisco and attendant removal from his mother's influence was precisely what he needed before he would resume a gainful employment as he was then capable of doing, but contrary to what he told Dr. Sutter, the libelant desired his fit for duty slip to sever his connection with the marine hospital and to get private care from Dr. Morrison. He affirmatively rejected the treatment offered him at the marine hospital although such treatment had at all times been of the highest order.

## XXVII.

The libelant, having procured his discharge from the marine hospital, entered a private hospital on that same day as the patient of Dr. Morrison. From that date, January 11, 1954, until the trial of this cause, the libelant remained a patient of Dr. Morrison's, and was hospitalized on more than a dozen occasions. Whether all or most of these hospitalizations were the result of one or more subsequent flare-ups in the libelant's illness does not appear from the record, nor does it appear that the treatment effected any real

or significant change in the libelant's condition.

## XXVIII.

When the respondent sent the libelant to the marine hospital, it thereby nominated that facility as the institution from which he was to receive his medical care. The treatment so proffered was, in all respects, proper and adequate. All of the care which libelant might have required subsequent to January 11, 1954, was at all times available to him there, and he was at all times eligible to obtain it. The libelant knew this, and his continued refusal to accept such treatment was unequivocal and final.

## XXIX.

Assuming that all of the treatment received by libelant subsequent to January 11, 1954, was both proper and necessary, the libelant could not, and, of course, did not, prove what, if any, period he would have been on outpatient status, had he accepted this treatment from the marine hospital where all necessary and proper treatment required by him was at all times available.

## XXX.

Libelant, while undergoing treatment under Dr. Morrison, lived in his mother's home when on outpatient status. He incurred no expense or liability for his care and support there. This also applies to the sums expended for his medical care, hospitalization, etc., all of which were paid for by his mother.

### Conclusions of Law

#### I.

This is a libel in admiralty by a seaman seeking to recover maintenance and cure from a shipowner and is within the admiralty and maritime jurisdiction of the United States and this court.

#### II.

A seaman becoming sick or disabled in the service of his vessel is entitled to be maintained and cured at the shipowner's expense. The right to such maintenance and cure extends to "a fair time after the voyage in which to effect

such improvement in the seaman's condition as reasonably may be expected to result from nursing, care and medical treatment", Calmar S. S. Corp. v. Taylor, 303 U.S. 525, 58 S.Ct. 651, 654, 82 L.Ed. 993, 1938 A.M.C. 341, or to be cured as far as possible, Farrell v. United States, 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850, 1949 A.M.C. 613. As found by the court, the libelant reached that stage of improvement on January 11, 1954. He was not entitled to maintenance and cure thereafter although he will require continued medical observation, see Peterson v. United States, 9 Cir., 224 F.2d 748, 1955 A.M.C. 1555, also involving a case of chronic glomerulonephritis.

### III.

■■■ The duty of a shipowner to provide maintenance and cure is a duty to tender adequate hospitalization, The Saguache, 2 Cir., 112 F.2d 482, 1940 A.M.C. 1203, and our courts, taking cognizance of the marine hospital facilities, limit recovery by seamen "to the expense of such maintenance and cure as is not at the disposal of the seaman through recourse to that service" where marine hospital care is tendered, Calmar S. S. Corp. v. Taylor, supra.

### IV.

■■■ A seaman who fails to report to the marine hospital and take treatment there loses his right to maintenance and cure. United States v. Loyola, 9 Cir., 161 F.2d 126, 1947 A.M.C. 994; June v. Pan American Petroleum & Transport Co., 5 Cir., 25 F.2d 457, 1928 A.M.C. 829. The election of the facility, so long as that chosen is proper and adequate, is in the shipowner, and the seaman may not usurp that election with impunity. Where the shipowner has proffered the marine hospital to a seaman and the latter leaves that hospital or otherwise rejects the treatment afforded there, he loses his right to maintenance and cure. The Gateway City, 5 Cir., 1939, 103 F.2d 987; The Santa Barbara, 2 Cir., 1920, 263 F. 369; Bailey v. City of New York, 2 Cir., 153 F.2d 427, 1946 A.M.C. 369; Miller v. Lykes Bros. Ripley Steamship Company, Inc., D.C.La., 1937 A.M.C. 1545; Stewart v. United States, D.C.La.1928, 25 F.2d 869. The libelant herein rejected the marine hospital treatment available to him, and, even if he had not reached maximum improvement on January 11, 1954, cannot recover for maintenance or cure, which remedies are co-extensive.

### V.

■■■ A claim for maintenance and cure is an ordinary contract claim arising out of an implied obligation of the seaman's contract of employment. The ordinary rules of contract law with respect to mitigation of damages apply, and a seaman seeking maintenance and cure can only recover for such periods as in the exercise of due diligence he could not avoid, see Warren v. United States, D.C.Mass.1948, 75 F.Supp. 836. The libelant, even if he were entitled to recover herein, has failed to carry his burden of proving what, if any, periods of outpatient care were necessary, i. e., would have been incurred if the marine hospital facilities had been utilized. Thus, even if his right to maintenance, apart from cure, had not been forfeited by his rejection of the marine hospital treatment, he could not recover because he has failed to meet the burden of proof.

### VI.

■■■ The libelant was maintained at the expense of his mother subsequent to January 11, 1954, and the latter also paid for his medical care at the same time. He therefore "incurred no expense or liability" for these items, and, in the absence of anything else, could not recover for them herein, Johnson v. United States, 333 U.S. 46, 68 S.Ct. 391, 92 L. Ed. 468, 1948 A.M.C. 218; Field v. Waterman S. S. Corp., 5 Cir., 104 F.2d 849, 1939 A.M.C. 1555.

The respondent has fully discharged its obligation to provide maintenance and cure to the libelant, and a decree has been entered in favor of respondent, dismissing the libel.