John SPERO, Libellant,

v.

STEAMSHIP THE ARGODON, her engines, boats, tackle, etc., in rem, and Meadowside Shipping Company, of London, England, a foreign corporation or association, as owners, and A. Lusi, Ltd., of London, England, as operators and agents of said vessel, in personam, Respondents.

No. 7748.

United States District Court
E. D. Virginia, Norfolk Division.

April 9, 1957.

As Amended April 19, 1957.

1

---

Sidney H. Kelsey, Peter K. Babalas, Norfolk, Va., for petitioner.

Seawell, Johnston, McCoy & Winston, Leon T. Seawell, Jr., Norfolk, Va., for respondents.

HOFFMAN, District Judge.

This action in admiralty, in rem and in personam, involves a claim of libellant as Third Engineer on the S/S Argodon for personal injuries, maintenance, and wages including "waiting time" under 46 U.S.C.A. §§ 596, 597. Libellant was injured on November 7, 1955, while the vessel was in the port of Hampton Roads awaiting the loading of cargo, during which time minor repairs and general maintenance were in progress in the engine room where the accident occurred.

Libellant is a citizen of Greece, having signed on the British vessel at Bremen, Germany, in May, 1955, as Fourth Engineer. When the position of Third Engineer became vacant, libellant was promoted. The vessel had been in Norfolk for approximately six days when libellant was injured.

■ Exceptions have been filed to the jurisdiction of the Court. It is conceded that, as of the date of the filing of the libel herein on November 30, 1955, wages in the sum of $208.98 were due libellant. Under the authority of the following cases jurisdiction appears to be determined with a certain degree of finality: The Fletero v. Arias, 4 Cir., 206 F.2d 267, 1953 A.M.C. 1390, certiorari denied 346 U.S. 897, 74 S.Ct. 220, 98 L.Ed. 398; The Belgenland, 114 U.S. 355, 5 S.Ct. 860, 29 L.Ed. 152; Heredia v. Davies, 4 Cir., 12 F.2d 500; O. & Y. Nuri v. The Johanna, 4 Cir., 210 F.2d 261, 1954 A.M.C. 440; Samad v. The Etivebank, D.C., 134 F. Supp. 530, 1956 A.M.C. 1603.

■ Under Samad, supra, it emerges that the law of the flag controls the maritime tort, but there has been no effort to prove the British law as, indeed, it is substantially the same as the law of this country. Samad v. The Etivebank, supra.

■ On the day of his injury libellant had been working in the engine room on the 8 A.M. to 5 P.M. shift. The Second Engineer was relatively new on the job, and libellant, in his capacity as Third Engineer, had been instructed by the Chief Engineer to keep a watch over his immediate superior. Having performed certain duties with respect to the forward generator, libellant, at approximately 3 P.M., proceeded to the opposite side or corner of the engine room where the Second Engineer was working on the ballast pump. His path caused him to go between the main engines and boilers to a platform consisting of steel floorplates located in the vicinity of a Gwyn pump. One of these floorplates, approximately three feet square, had been removed thereby exposing a hole in which certain pipes were located. Approaching the open area in an effort to reach the Second Engineer, libellant slipped on a coating of oil covering the floorplates and fell into the hole. In an effort to minimize his fall, libellant grabbed the removed floorplate which was leaning against the Gwyn pump and pulled it over upon his leg and thigh.

The evidence reveals that, while the ship was at Richmond a few days prior to the accident, an oiler deserted. A wiper was then promoted to oiler. In his new capacity the oiler worked on a regular shift as oiler and then served an addi-

tional four hours per day as wiper and/or fireman on an overtime basis. On the day in question the oiler worked on an overtime basis from 8:30 A.M. to 11:30 A.M., but his primary assignment was to clean and protect the underneath piping which could only be reached by the removal of the floorplate. This was a duty ordinarily performed by a fireman. Not having completed his work on the pipes, the oiler left the floorplate off, with the hole exposed, intending to return the following morning to finish his duties.

The Chief Engineer concedes that it would have been safe practice for the employee to replace the floorplates upon completion of his work, but insists that, in practice, whole plates of the engine room are left open for days while the vessel is in port. The floorplates weigh only approximately 35 pounds, but are unwieldy and require at least two men to replace because of the fitting.

Although the temporary fireman-oiler did not testify in the case, there is evidence indicating that the Chief Engineer observed him sweeping the floors at approximately 11:30 A.M., just prior to going off duty. Subsequent to that time there was no one in the engine room charged with the responsibilities ordinarily imposed upon a wiper. To what extent any film of oil had been removed from the floorplates is at least dubious. All witnesses testified that the engine room and its floorplates were not as clean as when the vessel is at sea. Several witnesses observed skid marks in an oil spot where libellant had slipped.

While libellant stated that the lighting was "poor" in the engine room, such a finding is not established by a fair preponderance of the evidence. In fact, in the immediate locality of the missing floorplate, there is a light which reasonably illuminates the area. Additionally, libellant could have diverted his path to the extent of avoiding the exposed hole. He had the same knowledge as others with respect to the general condition of the engine room and the film of oil on the platform and floor. He is, therefore, guilty of contributory negligence which

will reduce his damages proportionately. Dixon v. United States, 2 Cir., 219 F.2d 10.

Respondents urge that such contributory negligence of libellant is sufficient to bar his right of recovery under the doctrine of Walker v. Lykes Bros. S. S. Co., 2 Cir., 193 F.2d 772. In Boat Dagny, Inc. v. Todd, 1 Cir., 224 F.2d 208, 211, the reasoning in Walker, supra, is rather sharply criticized wherein the court refused to attach different consequences to "the two species of contributory fault". This Circuit has declined to choose which course to pursue as between the First and Second Circuits, but has suggested that Walker would only be applicable in any event to a master of an ocean going vessel. Mason v. Lynch Brothers Company, 4 Cir., 228 F.2d 709. Clearly the doctrine cannot be extended to a Third Engineer not primarily charged with the duty of keeping oily substances from the engine room floor.

The combination of oil on the floorplates and the removed floorplate furnishes sufficient evidence to constitute an unseaworthy condition of the vessel. The fact that no wiper was on duty and the ship was undergoing general maintenance repairs in its engine room is all the more reason why the floorplate should have been replaced when work in this area was abandoned at 11:30 A.M. until the following morning. The presence of oil on the engine room floor would not, standing alone, be sufficient to impose liability for unseaworthiness under the facts of this particular case, but the combination of circumstances leads to the conclusion of liability.

On November 8, 1955, libellant was taken to the United States Public Health Service Hospital at Norfolk, by the Radio Officer of the Argodon, the latter being in charge of making up the wage accounts for all seamen on the vessel. He was discharged on December 5 as fit for light duty for a period of one month, and thereafter fit for duty. In the interim, the present action had been filed on November 30, and his proctor referred him to Dr. John A. Vann, an orthopedic sur-

geon. Dr. Vann and Dr. George A. Duncan, both of whom are recognized as outstanding in the field of orthopedic surgery, testified with respect to libellant's injuries. His complaints, many of which were subjective in nature, were directed to the lower back region and Dr. Vann's examination on December 7, 1955, revealed that he had definite spasm of the lumbar muscles in his back with some restriction in motion. There was some suspicion of an injury to the lumbar disc, but this initial suspicion is dissuaded by libellant's subsequent activities and Dr. Duncan's later examination. In any event, such is too conjectural to give consideration to in awarding damages. No fair evaluation of any permanent injury, if any, could be made by either physician. The estimated period of disability from work was three months from the date of injury.

Dr. Duncan examined libellant on February 24, 1956. He reported motions of the back, particularly flexion, as slightly limited. Some tenderness also existed. No injury as a result of the accident was revealed from x-rays. It was Dr. Duncan's conclusion that libellant had sustained a contusion of the right side of his mid-back region and of the right thigh.

It is the conclusion of this Court that, subject to reduction for contributory negligence, libellant is entitled to $2,000 for his pain, suffering, mental anguish and loss of future wages. Attributing 20% to his contributory negligence, libellant is entitled to a decree in the sum of $1,600 for the maritime tort.

The claim for maintenance is of little consequence. The testimony indicates that when libellant left the hospital and became an out-patient, the local agents for the vessel provided accommodations at the Hotel Fairfax for approximately one week and furnished libellant with the sum of $4 per day for food. Thereafter, rooming accommodations were located at the home of a woman who was able to converse with libellant in Greek. He makes no complaint as to the housing facilities supplied to him, nor does he urge that he was unable to feed himself on $4 per day. His proctors insist, however, that he is entitled to $8 per day which is the contractual arrangement between American shipping interests and the National Maritime Union. Evidence of such a contractual arrangement is entitled to some weight, but it has no binding effect where the seaman is not a member of that Union, nor any other Union having a similar contract. While at the rooming house, the shipping agent paid the landlady $10 per week, or approximately $1.43 per day which, together with his subsistence allowance of $4 per day, made a net amount allowed for maintenance in the sum of $5.43 per day. It is not unreasonable for shipowners to arrange housing accommodations for foreign seamen in homes where they may converse with others speaking the same language—in fact, such an arrangement is desirable assuming, of course, that the accommodations are proper under all other circumstances. Maintenance in the aggregate sum of $277 was paid for the period beginning December 5 and ending January 24. His last treatment as an out-patient at the hospital was on January 18, 1956, when he was again released to see Dr. Vann, but libellant apparently did not report to Dr. Vann as his last examination was on January 16.

The best evidence available as to when libellant was fit for duty is Dr. Vann's estimate of three months from the date of injury. Accordingly this would be on or about February 7, 1956. Maintenance was paid through January 24. The testimony does not indicate where libellant resided after that date. Computing his maintenance for a period of two weeks at $6 per day justifies a recovery of $84 on the third cause of action for maintenance. Gardner v. Sinclair Refining Co., D.C., 129 F.Supp. 225, 1955 A.M.C. 1100, affirmed per curiam 3 Cir., 227 F.2d 958, 1956 A.M.C. 79. There is no merit to libellant's contention that he is entitled to maintenance until he was repatriated and, furthermore, the evidence indicates that libellant was offered and refused several jobs. There is no testimony indi-

cating that subsequent to February 7, 1956, libellant's condition would improve to any extent and maintenance should cease at the point of maximum cure. Peterson v. United States, 9 Cir., 224 F.2d 748, 1955 A.M.C. 1555.

The second cause of action for wages presents no difficulties other than the imposition of the "waiting time" provision as provided by 46 U.S.C.A. §§ 596, 597, if the same is proper in this case. Admittedly there were wages due libellant in the sum of $208.98 at the time he left the vessel following his injury. He entered the hospital on November 8, 1955, at which time the uncontradicted evidence is that he requested his earned wages from the Radio Officer who, agreeably to the Master, was charged with the responsibility of making up the wage accounts and who, according to libellant, paid off the crew. In response to libellant's request, the Radio Officer stated to libellant that he would send the wages and personal effects to the hospital. The Master admitted deputizing the Radio Officer to tender libellant his wage account, but stated that the agent (Hasler) was the one actually to pay the money. The vessel apparently sailed on the same day or night that libellant was taken to the hospital.

According to the shipping agent, no efforts were made to pay the earned wages until after the libel was filed on November 30, 1955, although the wage account was turned over to the agent by the Master. The practice appears to be for the agent to hold the wages and seaman's papers until he is released from the hospital, and the hospital discourages paying seamen large sums of money during their period of treatment at the institution because of the danger of loss by theft. While this procedure is not without merit, it does tend to strengthen the jurisdictional questions arising in matters such as are involved herein.

The agent testified that he offered libellant his wages on the day he was released from the hospital, that is, December 5, 1955, but libellant advised him that he had retained an attorney and the agent thereupon telephoned the attorney. Libellant denies that the agent made any offer of wages. A sharp conflict arises as to whether the attorney told the agent to pay the earned wages in installments, or whether the agent declined to pay the full amount of earned wages as claimed by the attorney. It is obvious that the agent had been laboring under the impression that the full amount of earned wages could not be paid without subjecting the shipowner, agents, vessel, etc., to a fine in the sum of $1,000 imposed by Immigration authorities. While United States v. Seaboard Surety Company, 4 Cir., 239 F.2d 667, decided December 17, 1956, does not expressly pass upon the identical situation herein presented, it is thought that a reasonable interpretation of the cited case would hardly justify the imposition of such a fine by Immigration and, in any event, earned wages less one cent could have undoubtedly been paid. If shipowners or their agents are still fearful of the imposition of any such fine, they may always protect themselves by paying the earned wages less one cent, thereby obviating the confusion which has heretofore existed.

On December 8 the agent paid libellant $50 on account of his wages. Eight days later the agent remitted an additional $100 as an "advance against wages due". Service was accepted in behalf of the Argodon on December 21, 1955, by the action of proctors endorsing the alias attachment and monition. The agent apparently knew of the claims for wages and maintenance on either December 5 or December 8. Depositions of the ship's officers were taken on January 6, 1956, reference being made to earned wages in the examination of the Master. The testimony of libellant was taken in open court on February 28, 1956, at which time further reference was made to the claim for wages. Libellant left the country during the early part of March with a balance of $58.98 admittedly due to him by way of wages. It was not until April 23, 1956, that the remaining balance of $58.98 was forwarded to one of the proctors for libellant by proctors for respond-

ents. This amount was accepted without prejudice to the double wage claim. Thereafter, on May 4, 1956, respondents deposited in court the sum of $2,171.83, same being the full amount of earned wages, plus penalty from November 8, 1955, to and including May 4, 1956; but this deposit was made without prejudice to respondent's rights in the premises.

Libellant's daily wage was two pounds, three shillings and four pennies, or approximately $6.10 per day. It is well settled that the number of days for which respondents must pay double wages rests in the discretion of the Court and depends upon the equities of the particular case. Mystic S. S. Co. v. Stromland, 4 Cir., 20 F.2d 342, certiorari denied 276 U.S. 618, 48 S.Ct. 213, 72 L.Ed. 734; Mavromatis v. United Greek Shipowners Corp., 1 Cir., 179 F.2d 310, 316; Samad v. The Etivebank, supra. Assuming that the shipping agent and counsel for libellant misunderstood each other as to the time and manner of payment of wages, it is nevertheless evident that libellant was still insisting upon the payment of his wages as late as February 28, 1956, when he testified in open court. Despite this fact, no effort was made to pay the balance of wages and "waiting time" until May 4, 1956. Such action is tantamount to "neglect" and is "without sufficient cause", which subjects the respondents to double wages for a period of sixty-six days or a total of $805.20. Prior to February 28 there are equities to be considered on both sides. Counsel for libellant, upon receiving partial wage payments in December, were within their rights to assert in writing libellant's demand for the balance of his wages. The shipping agent, or his counsel, may have insisted upon the payment of the balance of the earned wages by appropriate written notice to libellant or his proctors. Neither party acted as above stated. But when libellant was obviously still asserting his claim for wages at the time of his hearing in open court, there no longer existed any moral justification for prolonging the matter, and the continued action of the shipowner at least constituted a fail-

ure not attributable to impossibility of payment. Collie v. Fergusson, 281 U.S. 52, 50 S.Ct. 189, 74 L.Ed. 696, 1930 A.M. C. 408.

Proctors for libellant will prepare a decree in accordance with this opinion which is adopted by the Court as its findings of facts and conclusions of law in accordance with general Admiralty Rule 46½, 28 U.S.C.A., and, after presentation to proctors for respondents for inspection, present the decree to the Court for entry.