James F. DOBBS, Appellant,

v.

LYKES BROS. STEAMSHIP COMPANY, Inc., Appellee.

No. 16012.

United States Court of Appeals Fifth Circuit.

March 28, 1957.

Rehearing Denied May 3, 1957.

---

Raymond F. Kierr, New Orleans, La., for appellant.

Edward S. Bagley, Andrew R. Martinez, New Orleans, La., Terriberry, Young, Rault & Carroll, New Orleans, La., of counsel, for appellee.

Before BORAH, RIVES and TUTTLE, Circuit Judges.

RIVES, Circuit Judge.

This appeal is from the dismissal of a libel by a seaman seeking to recover for maintenance and cure.[1] The appellant had been Chief Electrician aboard the S.S. Genevieve Lykes for several voyages prior to July 24, 1953. On that date he was admitted to the United States Public Health Service Hospital at New Orleans [2] (hereinafter referred to as the Marine hospital), for a kidney ailment which was diagnosed as chronic glomerulonephritis (nephrotic stage). He remained an inpatient at the Marine hospital until January 7, 1954, or for nearly six months. It is without dispute that during that period he received unusually skillful, competent and diligent treatment and attention.

On January 7, 1954, the appellant was discharged from inpatient status at the Marine hospital to outpatient status with the following notation on his record:

"It is felt at this time that the patient is physically fit to return to duty, but because of the marked weakness which continues, he was discharged not fit for duty with de-

termination of fitness for duty to be made as an outpatient. * * * It is our opinion that the patient should be returned to duty as soon as feasible because of the mother-son relationship."

He was given a return appointment slip under which he was to receive his first outpatient check-up on the following Monday, January 11, 1954. From the time of his discharge from inpatient status at the Marine hospital on Thursday, January 7, 1954, to his return for the check-up on Monday, January 11, 1954, appellant and his mother saw numerous doctors: a urologist at a private clinic in New Orleans, a physician at the Veterans Administration Regional Office, Dr. Edgar Hull, an eminent specialist who had been called as a consulting physician at the instance of the mother while Dobbs was a patient in the Marine hospital, and Dr. Benjamin O. Morrison, to whom Dobbs was referred by Dr. Hull, again at the instance of his mother.

On Dobbs' initial visit to Dr. Morrison, the doctor told him that he could not undertake his treatment while he was receiving concurrent treatment at the Marine hospital. When Dobbs returned to the Marine hospital for his first outpatient appointment as scheduled on Monday, January 11, he undertook to procure his discharge. The district court found that he told Dr. Sutter, the physician at the Marine hospital primarily in charge of his case:

"(a) He desired a fit for duty slip; (b) he felt good except for residual weakness; (c) he wished to go to San Francisco and would procure any further medical care which he might require at the United States Public Health Service Hospital there; (d) he needed a fit for duty slip to 'clear with his union.'"

In accordance with that request, Dr. Sutter gave Dobbs a fit for duty slip, and noted at the time in the outpatient rec-

---

1. A branch of the law recently discussed by this Court in Couts v. Erickson, 241 F.2d 499; and in Rofer v. Head & Head, Inc., 226 F.2d 927.

2. See 42 U.S.C.A. § 249.

ord: "Now feels good except for residual weakness. Desires F.F.D. (fit for duty) slip. F.F.D. (fit for duty) slip given."

On the same day he entered a private hospital as the patient of Dr. Morrison, and from that date until the trial in the district court, beginning April 12, 1955, he had remained a patient of Dr. Morrison and had spent most of his time in the private hospital. With reference to the later hospitalization of the appellant on the same date on which he was discharged as fit for duty, the district court found: [140 F.Supp. 735]

"Dr. Morrison gave the libelant an examination in his office and checked the albumin in the libelant's urine. The latter test gave a 4 plus determination, which Dr. Morrison appeared to regard as very serious, and which apparently was the ultimate reason for his hospitalization of the libelant on Monday, January 11, 1954. The testimony of Dr. Hull revealed that a single test of this nature would not be significant, and would merely indicate a need for future observation. The court accepts the latter interpretation of this test as correct. The lack of significance in the albumin test is further borne out by the fact that on a subsequent hospitalization at Mercy Hospital in New Orleans, from October 18 to 20, 1954, Dr. Morrison discharged the libelant although he had 4 plus albumin in his urine during the entire course of his hospitalization, including the day of discharge."

The case is further complicated by some mental, nervous, or emotional trouble from which the appellant suffers, and as the result of which, several months after the trial in the district court, he became a patient at the Southeast Louisiana Hospital, and by the possibility that his kidney trouble and the medication administered therefor may have aggravated his mental illness. Those com-

plications have spurred his already able and careful counsel to the exercise of unusual skill and diligence in the prosecution of his claim. There was, however, no suggestion from any of the physicians who testified at the trial that the appellant was not then, and at the time of his discharge from the Marine hospital, fully in possession of his mental faculties. In addition, the appellant testified in his own behalf, and his actions and demeanor were observed by the district court. In the course of his testimony, the following colloquy occurred:

"The Court: * * * You seem to be all right as far as your appearance. You've been able to sit here for an hour and three quarters about, without any particular discomfort apparently. Why couldn't you have been working during that time? Is it your idea—

"The Witness: Your Honor, did you notice me taking something awhile ago when we first came into court? It was a sedative."

The issue was narrowed to the right to recover for maintenance and medical expenses after January 11, 1954. As expressed by the district court:

"The parties agreed on the trial of this cause that the respondent was willing to pay the maintenance due the libelant during the period of outpatient care at the marine hospital, viz.: January 7th to 11th, 1954, and the respondent has deposited the maintenance for this period in the registry of the court since the time of the trial, together with a sum sufficient to include the libelant's costs. The only issue accordingly is the maintenance and medical expenses which libelant claims for the period subsequent to January 11, 1954."

Upon that issue the district court found facts [3] upon which it made the following conclusion of law:

---

3. "As the name implies, the libelant's illness is a chronic one, but it may entirely disappear by a spontaneous remission. The reason for such a disappearance is

unknown to medical science, and is unrelated to any treatments presently available. During the course of the disease its patients will suffer 'attacks' in the

"A seaman becoming sick or disabled in the service of his vessel is entitled to be maintained and cured at the shipowner's expense. The right to such maintenance and cure extends to 'a fair time after the voyage in which to effect such improvement in the seaman's condition as reasonably may be expected from nursing, care and medical treatment,' Calmar S.S. Corp. v. Taylor, 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993, 1938 A.M.C. 341, or to be cured as far as possible, Farrell v. United States, 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850, 1949 A.M.C. 613. As found by the court, the libelant reached that stage of improvement on January 11, 1954. He was not entitled to maintenance and cure thereafter although he will require continued medical observation, see Peterson v. United States, 9 Cir., 224 F.2d 748, 1955 A.M.C. 1555, also involving a case of chronic glomerulonephritis."

■ That conclusion cannot, in our opinion, be seriously questioned. Nor can we say, after the most careful examination of this record, that the findings of fact by the district court, with its advantage of seeing and hearing the witnesses, were clearly erroneous.[4] McAl-

---

sense that the chronic disease will flare up into an acute or sub-acute stage.

"The libelant at the time of his discharge from the marine hospital had received all the improvement in his condition that could reasonably be expected to result from nursing, care and medical treatment; he had received the maximum benefits available from such nursing, care and medical treatment. This is true despite the fact that the marine hospital would have continued to follow the libelant on outpatient status in the absence of his request for a discharge. He was cured as far as possible, and could return to a gainful occupation although the need for continued observation probably would prevent his return to sea."

4. Dr. Sutter's testimony comprised one hundred typed pages. His opinion and that of Dr. Morrison differed. The district judge, however, thought that Dr. Sutter made "a very, very impressive witness," that "he was just as frank and objective as he could possibly be."

Dr. Sutter testified that he would have continued Dobbs as an outpatient and would not have discharged him as fit for duty if Dobbs had not asked for the discharge, and on cross-examination explained in some detail the reasons for his discharge as fit for duty.

"Q. At the time of Mr. Dobbs' discharge from outpatient status, was it the consensus of the doctors at the Marine Hospital that he would have no recurrence of his symptoms or that there was reasonable medical probability that he would have a recovery?

\*      \*      \*      \*      \*

"The Witness: As I stated already, previously, this condition often flares up again and again and again and he was not well from the condition at the time of discharge. We realized that fact and we realized the fact that he may never get over the condition. Does that answer your question, sir.

"The Court: You mean at the time he was discharged to outpatient status?

"The Witness: That's right. He was not well. We did not consider him over his kidney condition by any means.

"By Mr. Kierr: Q. Does that observation, doctor, apply to his discharge from the hospital to outpatient status as well as from outpatient status to his fit for duty status? A. Those remarks apply to both.

"Q. Yes, sir. Would you explain the reason that—would you explain in detail the reason that the fit for duty discharge was given to him, sir? A. Yes sir. Primarily for three reasons, I'd say. Firstly, because I felt that he was fit for duty and that his trip would do him no harm. Secondly, from a psychiatric standpoint it had been strongly advised and thirdly because—

"The Court: Strongly advised that what?

"The Witness: To put him back to active duty as soon as possible for rehabilitation from the psychiatric standpoint. Thirdly, he asked for the fit for duty slip so that he could straighten up with his union or shipping company prior to going to San Francisco."

On further cross-examination, Dr. Sutter testified:

"Q. At the time Mr. Dobbs left the Marine Hospital, doctor, was his condition active or inactive? A. You're talking about the time he was discharged from the hospital?

"Q. Yes, to outpatient status. A.

lister v. United States, 348 U.S. 19, 20, 75 S.Ct. 6, 99 L.Ed. 20.

We find it unnecessary to examine the several additional or alternative reasons assigned by the district court for its judgment of dismissal. The judgment is affirmed.

Affirmed.

Was his condition active or inactive?

"Q. Yes. A. It was considered inactive at that time.

"Q. And how about the date of his discharge from the outpatient department on January the 11th? A. It was considered inactive at that time or at least that it had met a plateau. In a case of nephrosis and glomerulonephritis—and I don't like to give expert testimony but to explain this, you have to follow a patient for months and years and usually until they die which might not be too long in any case of nephrosis with sedimentation rates and addis counts and those would have been performed had he continued as an outpatient."