**Olav REIERSEN, Appellant,**

v.

**MISSISSIPPI SHIPPING COMPANY, Appellee.**

**No. 17718.**

United States Court of Appeals
Fifth Circuit.
June 30, 1959.

Jack C. Benjamin, Raymond H. Kierr, Samuel C. Gainsburgh, New Orleans, La., for appellant.

Walter Carroll, Jr., Andrew R. Martinez, Rufus C. Harris, Jr., New Orleans, La., for appellee.

Before HUTCHESON, Chief Judge, and RIVES and WISDOM, Circuit Judges.

RIVES, Circuit Judge.

The appellant seaman's complaint seeks a recovery of $50,000.00 under the Jones Act, 46 U.S.C.A. § 688, and separately "for such maintenance (and cure) as may be found due, including for a reasonable period of time in the future, in the further sum, say, of $1,000.00." The complaint disclosed that the seaman signed on as boatswain on or about April 16, 1952, and that approximately two days later,

"On or about April 18, 1952, at approximately 3:30 p. m. when complainant was pursuing his duties on the main deck, in the vicinity of number two hatch, port side, he was caused to be struck upon the head and injured. * * * "

After a trial lasting two days, the district court directed a verdict for the defendant on the question of maintenance and cure but submitted the claim under the Jones Act to the jury with full instructions, including:

"Now there was one feature of the case which the court is withdrawing from the jury's consideration. That is for the maintenance and cure. Now that is to have no effect upon your verdict on the question of damages for unseaworthiness or negligence." [1]

The jury returned a verdict for the defendant and judgment was entered thereon.

The appellant urges that the district court erred in refusing to direct a ver-

dict for the plaintiff on the claim under the Jones Act, in directing a verdict for the defendant on the issue of maintenance and cure, and in refusing to transfer that claim to admiralty. He urges also that the district court erred in giving and in declining to give instructions to the jury and in denying a motion for a new trial.

Upon the trial, the evidence failed to establish that the plaintiff was struck upon the head, but did show that he fell to the deck. The plaintiff testified:

"Q. Now what, if anything, unusual happened to you? A. While I was standing there, I fell. You see, I got—I became startled by a motion on my—over to my side—right in the side. So I'm looking up, I saw this movement and I started to step back but my feet got tangled up or caught into something on deck and I—I fell right down.

"Q. Do you recall what it was that you saw move? A. I have no—I didn't see—I just saw the movement. It could have been a bird—I mean, I didn't even see an object. I saw more of a shadow of a motion on the side of me and that startled me and I started to step back and my feet caught and I fell down.

* * * * * *

"Q. On what did your feet get caught, Mr. Reiersen? A. I have no idea just what they caught on. Most likely it would be a piece of—short piece of wood, which there were several pieces around me.

"Q. Could they have gotten caught on each other? A. That is something I can't really say."

In denying the defendant's motion for directed verdict on the claim under the Jones Act, the district court said, out of the presence of the jury:

"The Court: I think the evidence is very, very thin but I think there

---

[1]. That instruction was emphasized by repetition:

"* * * In reaching your verdict you are not to be influenced in any measure by what the court has done with respect to maintenance and cure. It is a question that you are not to be concerned with at all."

is probably enough to take it to the jury. I don't think, however, the jury will have much trouble with it, but I think perhaps there is some evidence here, thin as it is, to go to the jury. Now that is on the question of seaworthiness and under the Jones' Act * * *."

There was evidence from which the jury might or might not have found the defendant negligent in permitting stacks of dunnage to be piled on the deck of the vessel. Clearly, the evidence was not conclusive that any such negligence caused the plaintiff to fall and be injured. Other than the testimony of the plaintiff himself, the only evidence as to the occurrence of the injury offered by either party was the testimony of Carl G. Pedersen, introduced as a witness by the plaintiff. To the surprise of plaintiff's counsel, Pedersen testified that while he was "up on top the masthead" he saw the plaintiff on the deck about twelve feet below looking up and then saw him keel over backwards, and that so far as he could see the plaintiff made no effort to catch himself; and he further testified on cross-examination by the defendant's counsel:

"Q. In your opinion, Mr. Peterson (sic), as a seaman who has been going to sea for some fifty years, did you consider the conditions of the deck on the Del Campo on this occasion to be unsafe in any way?

"A. No, sir."

The court permitted plaintiff's counsel to impeach, as best he could, the testimony of his own witness Pedersen by the use of an earlier discovery deposition of the witness.

■■ The court did not err in denying the plaintiff's motion for a directed verdict on the claim under the Jones Act. Nor did the court abuse its discretion in denying a motion for new trial based on the ground that Pedersen gave untrue testimony at the trial, took plaintiff by surprise, and deprived him of a fair trial. With plaintiff's counsel having been given full opportunity to impeach Pedersen by his former testimony, the truth or falsity of his testimony at the trial was for the jury's determination.

■ The plaintiff was taken to the Marine Hospital and treated for concussion of the brain and a lacerated scalp. He remained in the hospital from April 18, 1952, until June 2, 1952, when he was discharged "to be fit for duty in 15 days." He was paid maintenance at the rate of $8.00 a day for thirteen days following his discharge from the hospital. After being discharged, he went back to the hospital three times during June and July 1952 for outpatient treatment. He was declared "fit for duty" on July 22, 1952. He testified: "Well, I was never back to collect those last three days. I think it was three days; whatever it was."

The hospital diagnosis during the period of outpatient care was "post concussion syndrome, mostly hysterical." The trial took place on July 24, 1958, six years after the plaintiff had been discharged as fit for duty. The plaintiff testified:

"Q. Now have you had any medical treatment of any sort since your last visit to the Marine Hospital here in July of 1952?

"A. No, sir, I haven't had anything. I have been—I have been examined by doctors for a job, when applying for a job but I mean I haven't had any—I haven't been treated by a doctor."

During that six years, according to the plaintiff's own testimony, he had often been out of work. His attorney summarizes his claim for maintenance and cure as follows:

"* * * He worked irregularly following his injuries due to the fact that, as he said, he was afraid of heights and open spaces, which hampered his work on ships. He testified that he missed two months of work during the year 1952 following his injuries, during which time he was convalescing. Similarly, he

missed 4½ months in 1953, 9 months in 1954, 9 months in 1955, 6 months in 1956, 4 months in 1957, and 7 months in 1958, for which, he urges, he is entitled to an award of maintenance and cure, in addition to damages for loss of earnings, during these periods."

The two doctors who testified agreed that there was no evidence of neurological disturbance or injury. There was no proof to justify a reasonable inference that plaintiff's claimed illnesses throughout these six years during which he received no medical treatment were caused by his injury on the deck or his two days' service on the vessel. His hospital record under "History of Present Illness" shows that, "He had a fractured skull (rt. occipital region) in England in 1945." Under such circumstances, the duty of the shipowner to provide maintenance and cure did not extend beyond "a fair time after the voyage in which to effect such improvement in the seaman's condition as reasonably may be expected to result from nursing, care, and medical treatment." Calmar S. S. Corp. v. Taylor, 1938, 303 U.S. 525, 530, 58 S.Ct. 651, 654, 82 L.Ed. 993; see also, Farrell v. United States, 1949, 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850; Rofer v. Head & Head, Inc., 5 Cir., 1955, 226 F.2d 927; Dobbs v. Lykes Bros., 5 Cir., 1957, 243 F.2d 55; Murphy v. Light, 5 Cir., 1958, 257 F.2d 323.

▪ When the court announced that it would direct a verdict for the defendant on the issue of further maintenance and cure, a colloquy ensued between court and counsel showing that the court refused to transfer that claim to its admiralty docket.[2] Appellant insists that this was error because he was a "ward of admiralty," citing Garrett v. Moore-McCormack Co., 1942, 317 U.S. 239, 247, 63 S.Ct. 246, 87 L.Ed. 239. Nevertheless, the district court had jurisdiction of the maintenance and cure claim "pendent" to its jurisdiction under the Jones Act. Romero v. International Terminal Operating Co., 1959, 358 U.S. 354, 380, 381, 79 S.Ct. 468, 3 L.Ed.2d 368. There

2. "The Court: * * * but what about maintenance and cure. I haven't heard anything here to justify letting that go to the jury. This man says he doesn't feel he is getting worse so if he was hurt there is nothing here by which the jury could determine when he reached his maximum cure and he has been working right along and respondent would be entitled to a credit for his earnings ashore or elsewhere since that time.

"Mr. Gainsburgh: We will concede that if Your Honor please.

"The Court: There is no proof here as to what he earned.

"Mr. Gainsburgh: I beg your pardon?

"The Court: There is no proof here as to what his earnings were or as to precisely when he worked and when he didn't work. I'm going to take that feature from the jury.

"Mr. Gainsburgh: In which event, may we ask Your Honor to transfer the maintenance claim to the admiralty side of the court, particularly since—

"The Court: And give you two bites of the cherry?

"Mr. Gainsburgh: Particularly since there appears to be a lack of jurisdiction in view of Your Honor's statement. There is apparently some uncontested maintenance due in this case for several days for which the plaintiff has testified which he is entitled to recover.

"The Court: Three days you mean?

"Mr. Gainsburgh: Whatever it is, if Your Honor please, we believe that it merits—

"The Court: I'm not going to trouble myself over three days' maintenance.

"Mr. Gainsburgh: Mr. Benjamin advises me that it is thirty days in which case it is less than the jurisdictional amount. We submit to Your Honor that under the practice that has been enforced here that it should not—instead of being dismissed, should be transferred to the admirality (sic) side of the docket.

"The Court: No. I think it should have been tried to the court without a jury in the first place but you gentlemen said it exceeded the jurisdictional amount and you insisted on having it tried to a jury. Now we've tried it to a jury and it has petered out and now there is going to be a revival of it before the court? Not this court. I don't think that that is proper because you gentlemen knew what the situation was before you insisted on submitting it to the jury. I don't think there should be two trials of the same issue, the same case."

was no abuse of discretion in declining to transfer the claim to admiralty.

We have carefully examined the instructions, both those given and those refused, and find no reversible error. The judgment is

Affirmed.