Karl ROFER, Appellant,

v.

HEAD & HEAD, Inc., Claimant owner of Yacht VAGABONDIA, III, Appellee.

No. 15529.

United States Court of Appeals
Fifth Circuit.

Nov. 18, 1955.

As Amended Dec. 14, 1955.

Arthur Roth, Miami, Fla., for appellant.

Richard H. Hunt, Miami, Fla., for appellee.

Before RIVES, TUTTLE and JONES, Circuit Judges.

TUTTLE, Circuit Judge.

This is a seaman's libel for wages and maintenance and cure. The libelant was hired in November, 1953, to work as a cook aboard the yacht Vagabondia III. He was apparently in normal health when employed, but as the period of employment wore on, he became excitable and often upset, and once reached a state of frenzy. Before he left the vessel, the deckhands were afraid of him, saying that he had threatened them.

On the first or second of March, 1954, he complained to the captain that he had sprained his back in picking up an eighty-pound stove plate. The captain asked him if he wanted a certificate to the Public Health Service Clinic in Miami. The libelant refused, saying that he would prefer to go to his own doctor, a chiropractor who had treated him before. He did undergo such treatments on March 16, 17 and 18. He never had any other treatments for this condition, and the trial court found that he did not complain of its bothering him until the bringing of this libel.

About March 23, he complained of a cold. The captain asked him whether he wanted treatment available aboard or would prefer to go to a doctor, and informed him that the vessel would pull into Key West on the next day. The libelant said he would wait until then. When the vessel stopped there, he went ashore and bought a bottle of cough medicine. Then he returned to the yacht, and later on the 26th said he felt "fine." The next day he complained and said that he could not go on, and demanded that he be put ashore immediately. The captain gave him a letter of discharge and a certificate for treatment by the U. S. Public Health Service Clinic in Miami. He was taken to shore and to a bus stop, and when asked if he had enough money, said he had plenty. He told the captain to get a replacement for him.

He hitched a ride to the nearest town, where he consulted a doctor. He had a slight fever, and while undergoing treatment, took a room in a nearby motel. On March 31, he was told that he was well enough to travel. His main complaint at the time was about his back, and the doctor felt that the libelant's own physician could best treat this, although he would not say, either, that the cold had been completely cured.

Libelant delayed going until Friday, April 2, when he took a bus, arriving in Miami that afternoon. On the following

Monday, he visited his own doctor, and on Tuesday, he went to the Public Health Service Clinic. The examination at the clinic disclosed that libelant was suffering from viral myositis, post-influenza condition, and a paranoid tendency. He was put on out-patient care. His own physician found that he had the residue of a virus infection in his lungs, and a back pain.

He remained under the treatment of three doctors, each of whom did not know that he was being treated by the others, until June 26, 1954, when he was transferred to the Public Health Service hospital in Savannah. He was discharged from there on September 2, 1954. The psychiatrist there reported that there was no evidence of any psychosis, but that there were "areas of emotional immaturity" and that his "defense mechanism"—the gastro-intestinal condition, the main and perhaps only ailment treated in Miami and Savannah—was "rather unhealthy"; he concluded that the libelant was not fit for sea duty and should "be returned to Miami and receive psychiatric care at his own expense." The libelant returned to Miami, but did not seek or receive any such treatment.

*Wages.* The district court allowed the libelant no wages, "as his discharge was occasioned by his own action." His wages up to the date of discharge were paid by the vessel's owners.

The libelant contends that he is entitled to his wages for the remainder of the voyage, on the strength of Farrell v. United States, 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850, and The Osceola, 189 U. S. 158, 23 S.Ct. 483, 47 L.Ed. 760. The Osceola answered two questions certified to the Court by the Seventh Circuit. The main issue was whether a seaman's right to maintenance and cure, and to wages, is subject to the fellow-servant defense. No question was raised as to the length of the employment contract of the seamen aboard this lake vessel, and the Court answered that the vessel and her owners were liable for wages "at least so long as the voyage is contin-

ued." Farrell v. United States presented the converse of the instant case. There, in 1943, Farrell signed aboard under ship's articles which were drawn in vague terms for security reasons. The articles provided that the ship would go to such ports as directed by the United States government, "and back to a final port of discharge in the United States, for a term not exceeding 12 (Twelve) calendar months." Farrell was totally disabled while the ship was moored in Palermo, Sicily, and claimed wages for the remainder of the twelve-month period. The owners argued that he should be paid only until the time when the ship returned to a port of discharge in the United States.

In a divided opinion the court agreed with the owners. It said that the contract obligated the seaman to serve only until the port of discharge was reached, or twelve months had passed, whichever occurred sooner. It added that, except in the coastwise trade, the general custom is to sign on for a voyage and not for a fixed term. The dissenting opinion said that if this were a coastwise voyage, Farrell could unquestionably recover for the balance of the twelve months and that the seaman had actually bound himself for that period, the number of voyages being immaterial.

The Farrell case most directly answers the question regarding wages presented here. Rofer did not sign any articles on coming aboard, and was paid on a month-to-month basis. This being a coastwise voyage, the assumption would be that he was obligated to serve for a fixed period. The fixed period here could have been no longer than a month, and an ill seaman would then be entitled to wages for this length of time only.

The district judge found that the libelant's discharge was occasioned by his own actions. The evidence plainly shows that he was not fired, however. The captain, when Rofer demanded to be put ashore, asked him if he would not continue, and promised him a chance to rest for a day or two, and extra help in

the galley. Rofer adamantly demanded that he be put ashore, and told the captain he could find a replacement for him. The captain acquiesced in this course of action and it does not affirmatively appear that he discharged Rofer. The trial court's finding that the captain discharged Rofer for his own misconduct is clearly erroneous. The evidence likewise shows that Rofer was ill at the time, and that the vessel did not have adequate medical facilities to care for him. The court found that he was cured on March 31st. Therefore, he had a right to be put ashore and to receive pay for the month. The court found he was entitled to maintenance and cure until March 31st. The district court erred in not finding the vessel liable for the five days' wages accrued from March 27 to March 31st.

■ *Maintenance and Cure.* The libelant is here seeking maintenance and cure for a respiratory ailment, a back sprain, and mental derangement. The law regarding maintenance and cure was summarized by Mr. Justice Stone in Calmar S. S. Corp. v. Taylor, 303 U.S. 525, 58 S.Ct. 651, 654, 82 L.Ed. 993. The Court there held that the right to maintenance and cure, although once thought comparable to the sustenance and care to which the ill seaman would be entitled while at sea, had been construed by the lower courts to extend for a reasonable time beyond the duration of the voyage. These holdings it approved, as the result of a humane policy, noting that the lower courts had construed the reasonableness of the length of time under the special circumstances of each case. The court accordingly held that where, as in the Taylor case, a seaman has suffered an incurable disease, he is entitled to maintenance and cure only for "a fair time after the voyage in which to effect such improvement in the seaman's condition as reasonably may be expected to result from nursing, care, and medical treatment."

In seeking maintenance and cure for psychiatric care, the libelant relies on Spellman v. American Barge Co., 3 Cir., 176 F.2d 716. Spellman was a maid hired aboard the Bruce. As with the libelant here, she was apparently normal when first employed. Her conduct soon became odd, however, and finally irrational, and she was given a hospital ticket, taken off the ship, brought to a bus station, and given a ticket to Louisville. Two days later she was found in a dazed condition on the streets of her home town. Her condition was diagnosed as dementia praecox, catatonic state. When discharged from the Spencer State Hospital, she was described as being in a condition of partial remission, with little chance of complete recovery. The Third Circuit held that the lower court erred in instructing the jury that the captain's furnishing the hospital ticket discharged the vessel's obligation to provide maintenance and cure. Merely giving a mentally deranged person a hospital ticket was not enough, the court said, the captain being required to have Spellman conducted to a hospital, and to have her provided there with the maximum cure obtainable.

There can be no dispute here over the fact that Rofer was well enough to conduct himself to the Miami Public Health Service clinic. The only issue is whether there is a duty to provide maintenance and cure for further psychiatric treatments. The trial court made no specific finding of fact or conclusion of law on this issue.

■ Rofer's discharge from the hospital in Savannah cannot be construed as a discharge after the maximum cure obtainable was provided. However, it is true that there is no psychosis, but only emotional immaturity, and that the release itself must indicate that if there were paranoid tendencies, they were limited, assuming that the psychiatrist was aware of the dangerous propensities of paranoids. However, Rofer was declared not fit for sea duty and was specifically recommended for further treatment. Under the circumstances, if he had sought and received further psychiatric treatment, the court might have found that he was entitled to such care until

the maximum cure obtainable was achieved. Since, however, he did not seek such treatment, we cannot hold that it was clearly erroneous for the trial court to find that the owners should not be required to furnish him with maintenance and cure for a disorder which he himself did not seek, and to which he did not attach sufficient significance even to include it in his original libel filed in this case.

The trial court found that the libelant's cold received maximum cure on March 31, the date of his last treatment in Marathon, and allowed maintenance and cure until that date. It apparently ruled that the back sprain was cured by the treatments of March 16, 17, and 18. ("The libelant * * * reported no back complaints until the filing of this action.") The libelant concedes that he is entitled to no cure for this, because he declined an offered ticket to the Miami Public Health Service clinic. He argues, however, that he is entitled to maintenance for the period during which he was an out-patient at the clinic after leaving the ship. He contends that he was not cured of either his cold or his back sprain, and supports this by reference to the symptoms of these which he continued to report to the doctors there.

The truth of the matter is, however, that he complained of all sorts of things, including headaches, vomiting, gall bladder trouble, sinusitis, gastro-intestinal disturbances, biliary problems, fat intolerance, and radiating pains. The first records at the Miami clinic disclose the following diagnosis: "(1) Post influenza (2) Viral myositis (3) Paranoid tendency." The final record there, before libelant went to Savannah, reads: "July 23, 1954 Saw chiropractor who took (illegible), etc. & told him all sorts of things. Is in bad way today. All sorts of symptoms. Rx-Adm. Savannah for work up to end it once & for all. EB". The final record from Miami reads: "Sept 8 1954 Cert of Med Car from PHS Savannah Complete survey at Savannah revealed nothing organically wrong. (Illegible) psychological reaction—GI Immaturity reaction NFF sea duty. Recommended psychotherapy at own expense then re-evaluate P". Appellant did not have medical testimony in support or explanation of these records but merely introduced them in evidence.

The record sustains the trial court's finding that maximum cure for the back sprain was achieved on March 19th and for the cold on March 31st. The treatment, as opposed to the complaints, seem to have been of gastro-intestinal disorders, which the trial court regarded as unrelated to the back sprain or the cold. Actually, the doctors seem to have concluded that the real problem was a mild psychiatric condition. Rofer did not seek treatment for this.

The judgment is reversed as to the item of wages due for the remaining days in March, for which libelant was entitled to a judgment in the district court. It is affirmed in all other respects.

The judgment is reversed in part and affirmed in part.