**Rawlins Jack COUTS, Appellant,**

v.

**R. B. ERICKSON, owner of THE M/V CLARA B. TAYLOR, and Warren Fish Company, Appellees.**

**No. 16193.**

United States Court of Appeals
Fifth Circuit.

Feb. 21, 1957.

Samuel C. Gainsburgh, New Orleans, La., Arthur Roth, Miami, Fla., for appellant.

Joe J. Harrell, Jones & Harrell, Pensacola, Fla., for appellees.

Before RIVES, TUTTLE and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

On facts which are amazingly simple, Couts, a crew member of the fishing vessel M/V Clara B. Taylor, made out a classic[1] claim for maintenance and cure.

About October 26, 1954, in sufficient apparent good health, at least to satisfy the Master, Couts joined the M/V Clara B. Taylor in Florida for a fishing voyage to the Banks. While at sea fishing, a severe storm caused them to seek haven at Venice, Louisiana, but only after extended exposure to wind and weather of Couts and other crew members in the strenuous labor of manning hand pumps to keep the ship afloat after power pumps had failed. Subsequently the ship left Venice, bound for Pensacola. But by this time she was short[2] two hands who had apparently had their fill of these conditions.

On the homeward voyage, weather was again boisterous, cold, rainy and damp, the vessel was either making or taking considerable water and Couts, with others, was standing almost continuous watch working hand pumps on the open deck. A short time before arrival at Pensacola he was, not surprisingly, suffering with a cold which, within a few days after he left the vessel at Pensacola developed into pneumonia with high fever and incontestable symptoms of acute illness requiring immediate hospitalization at a United States Public Health contract facility. As soon as travel permitted, he was transferred to the United States Public Health Marine Hospital at New Orleans where he has been under treatment[3] since for tuberculosis.

---

1. With confidence unshaken by subsequent changes, which have expanded, not contracted, the principle, The Osceola, 189 U.S. 158, 159, 175, 23 S.Ct. 483, 47 L. Ed. 760, 764, declared in 1903: " * * * we think the law may be considered as settled upon the following propositions:

"1. That the vessel and her owners are liable, in case a seaman falls sick, or is wounded, in the service of the ship, to the extent of his maintenance and cure, and to his wages, at least so long as the voyage is continued.

\* \* \* \* \*

"4. That the seaman * * * is entitled to maintenance and cure, whether the injuries were received by negligence or accident * * *."

And see, Norris, Law of Seamen, Vol. 2, §§ 535–564 (1952).

2. The vessel's catch was also "short" since it was apparently disposed of by the Master at Venice without accounting either to the Owners or to crew members for their Lay.

3. At the New Orleans Marine Hospital, he was an In-patient from December 7, 1954 to April 1, 1955, when discharged to Out-patient status as "indefinitely not fit for duty" with continuation of chemotherapy directed; In-patient status was resumed August 16, 1955, to August 26, 1955. Within a few days, on September 1, 1955, In-patient status was again resumed and was continuing November 4, 1955, when libelant's deposition was taken at the hospital. The latest Clinical Abstract showed diagnosis "pulmonary tuberculosis, moderately advanced, active * * *" and prognosis "guarded."

Confusing this simple libel asserting rights incident to the seaman's employment in no way dependent upon negligence or unseaworthiness with one seeking *damages*,[4] the District Court, impliedly finding that the tubercular disability came from the ship's service, denied the relief sought. In doing so, the Court applied[5] notions of assumed risk which are impermissible either for damages[6] or maintenance and cure.[7]

Nor can this result be sustained on the *idea*, apparently advanced here for the first time, that maintenance and cure was lost because of purposeful, conscious concealment[8] by Couts of his prior history[9] of tuberculosis. There was, first, no evidence of any purpose,

4. The memorandum opinion commences: "In this case libelant seeks damages under the Jones Act (46 U.S.C.A. § 688) * * *" and concludes: "* * * this is clearly a case where respondent should not be held liable for damages suffered by libelant * * *." Specific, technical reference to the Jones Act, as such, indicates that the term "damages" was not inadvertently used in its loose, colloquial sense.
Perhaps the Court's misconception merely mirrored that of the ship's Proctor whose Answer to the Libel, almost admitting a classic case for maintenance, proceeds on the assumption that a causal relation to the vessel's tortious conduct must be shown, (Article 3 of Answer): "* * * The Libel shows no cause or connection between the claimed illness and the respondent * * * other than to say that the libellant was rendered ill during the course of his employment aboard the motor vessel 'Clara B. Taylor' during the month of November, 1954. For aught that appears, the libellant could have taken sick while ashore during that period of time through no fault of the respondent * * *."

5. The Court's opinion makes this plain: "The record of his tubercular illness of several years prior to his employment * * * was sufficient to have made it apparent to anyone in his condition that employment on a fishing vessel would be hazardous and dangerous, and this is clearly a case where respondent should not be held liable for damages suffered by libelant, while aboard respondent's vessel, and the court finds and holds that libelant shall recover nothing for maintenance and cure."

6. Whatever may be left of "true" assumed risk—injurious consequences from the inexorable vicissitudes of the calling—it has long been plain that, between ship and seaman, the seaman does not assume the risk, even if known, created or brought about by the vessel's unseaworthiness or the shipowner's negligence. The Arizona, 298 U.S. 110, 56 S.Ct. 707, 80 L.Ed. 1075, 1936 AMC 627; Beadle v. Spencer, 298 U.S. 124, 56 S.Ct. 712, 80 L.Ed. 1082, 1936 AMC 635; Socony-Vacuum Oil Co. v. Smith, 305 U.S. 424, 59 S.Ct. 262, 83 L.Ed. 265, 1939 AMC 1.

7. Aguilar v. Standard Oil Co., 318 U.S. 724, 730, 63 S.Ct. 930, 933, 87 L.Ed. 1107, 1113, 1943 AMC 451, 456: "In the United States this obligation [maintenance and cure] has been recognized consistently as an implied provision in contracts of marine employment. Created thus with the contract of employment, the liability, unlike that for indemnity or that later created by the Jones Act, in no sense is predicated on the fault or negligence of the shipowner. Whether by traditional standards he is or is not responsible for the injury or sickness, he is liable for the expense of curing it as an incident of the marine employer-employee relationship. So broad is the shipowner's obligation that negligence or acts short of culpable misconduct on the seaman's part will not relieve him of the responsibility * * * Conceptions of contributory negligence, the fellow-servant doctrine, and *assumption of risk* have no place in the liability or defense against it. Only some wilful misbehavior or deliberate act of indiscretion suffices to deprive the seaman of his protection * *." (Emphasis supplied.)

8. This general principle is discussed: Ahmed v. United States, 2 Cir., 177 F.2d 898, 1950 AMC 53; Lindquist v. Dilkes, 3 Cir., 127 F.2d 21, 1943 AMC 1202; cf. Tawada v. United States, 9 Cir., 162 F. 2d 615, 1947 AMC 947; Burns v. United States, D.C.Pa., 62 F.Supp. 603, 1945 AMC 1232; and see, Norris, The Law of Seamen (1952), Vol. 2, Section 557.

9. Libelant, on direct examination in the oral deposition and by medical testimony and exhibits, affirmatively proved that during 1952 he was hospitalized in Ohio for active tuberculosis for six months and subsequently, for approximately one year, in a Michigan sanitarium from which, in June 1954, he was discharged as fit for duty.

plan, or attempt to mislead, conceal, or misrepresent his prior medical history or the state of his health. Couts thought himself fit and so did the Master who saw him, sized him up,[10] and engaged him. And so, apparently, did the Owner, for he had served on a sister ship of that fleet earlier that month for a voyage without untoward effects.

■ Nor will the record support a conclusion that Couts, aware, of course, of his medical history of extended treatment, ought to have known that he was then unfit for service on fishing vessels. This contention assumes, what this record does not establish, that he was actually unfit in fact. The medical evidence is uncontradicted that five months before, Couts was discharged as fit for duty. The fact that on admission to the hospital in Pensacola he was acutely ill does not disprove this in the least. For, unessential as causal relation is to recovery for maintenance and cure, cf. Farrell v. United States, 336 U.S. 511, 69 S.Ct. 707, 709, 93 L.Ed. 850, 1949 AMC 613, and Calmar S.S. Corp. v. Taylor, 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993, 1938 AMC 341, the record is equally undisputed that for Couts the wet rigors of these "Two weeks [not years] Before the Mast" were more than enough to reactivate tuberculosis then in a quiescent, inactive, recovered state.

■ Moreover, assuming this *arguendo*, the record negatives the idea that Couts either had, or ought to have had, a conscious awareness of a basic unfitness. He knew he had been treated extensively for two years. But he also knew that he had been discharged as fit for duty. Was he required to have less confidence in the future than his expert caretakers? Was he required to read in what they did not say that fit for duty meant fit in Ohio but not Florida, fit for manual labor but not at sea? Could he not, having shortly completed one such voyage, assume that work had proved the doctors right? In any event, he could hardly have known more than the doctors. And here the record shows that for a considerable time after his transfer to the New Orleans Marine Hospital, X-ray, sputum and other tests were essentially negative. It was not until all of the X-rays and records from the Ohio, Michigan and Pensacola Hospitals were received and compared, that tuberculosis in an active state could be diagnosed. And this, far from showing merely a recurrent onset of long-standing active tuberculosis, established that the course of hospitalization in 1952 and 1953 had brought about "obvious reduction in size of the infiltrations" and there had been "stabilization [of the tubercular condition] subsequent to June 1954 * * *."

There was thus no misrepresentation or concealment or conscious breach of any warranty of seaworthiness by Couts, and if unfitness there may have been, it was not of the kind to destroy [11] the right to maintenance and cure so plainly required. In the light of this record, to introduce the refinements pressed here by the shipowner that an untutored worker must interpret a medical discharge "fit for duty" in a geographical, parochial, occupational sense would be to forget that: "It has been the merit of the seaman's right to maintenance and cure that it is so inclusive as to be relatively simple, and can be understood and administered without technical considerations. It has few exceptions or conditions to stir contentions, cause delays, and invite litigations * * * [and] to introduce a graduation of rights and duties * * * would alter the basis and be out of harmony with the spirit and function of the doctrine and would open the door to the litigiousness which has made the landman's remedy so often a promise to the ear to be broken to the hope." Farrell v. United States, 336 U.S. 511, at page 516, 69 S.Ct. 707, at

10. Silence could not have misled the Master for, in appearance, the treating Pensacola Public Health Physician described Couts as "something of a degenerated physical specimen—not a strong healthy man * * * [and] tall * * * [and] thin as a rail * * *."

11. See note 8, supra.

page 709, 93 L.Ed. 850, at page 854, 1949 AMC 613 at 617.

The decree dismissing the Libel is therefore reversed and the cause remanded with directions to award maintenance and cure in such amounts and for such periods of time as, under applicable principles, may be due.

Reversed and remanded.

See also D. C., 141 F.Supp. 385.