Albert C. FISH, Plaintiff,

v.

RICHFIELD OIL CORPORATION, a corporation, Defendant.

No. 71–59.

United States District Court
S. D. California,
Central Division.

Nov. 16, 1959.

Margolis, McTernan & Branton, by Ben Margolis, Los Angeles, Cal., for plaintiff.

Lillick, Geary, McHose, Roethke & Myers, by Lawrence D. Bradley, Jr., Los Angeles, Cal., for defendant.

YANKWICH, District Judge.

■ By this civil action a seaman seeks to recover damages in the sum of $10,000 under the Jones Act by reason of negligence,[1] and wages, maintenance and cure in various amounts under general and maritime law, for illness happening while "in the ship's service". Historically the remedies are, as to seamen, "independent and cumulative".[2] They are so generally recognized in whatever form or forum the action is brought.[3]

## I
### No Negligence Shown

■ The plaintiff, Albert C. Fish, an able-bodied seaman, was employed by the defendant, Richfield Oil Company, to be referred to hereinafter as "Richfield", on a tanker known as the "Charles S. Jones", on or about September 25, 1958, at a basic wage of $342 a month; plus overtime.

The employment was on open articles, i. e., a type of employment in coastwise trade which allows termination by either side at the end of the voyage, although the wages are paid every month. The testimony in the record shows that the employment was, by law and tradition, limited to coastal voyages and that each lap of the voyage, such as, for instance, the first lap from San Pedro to Honolulu, Hawaii, and the second lap from Honolulu to Hilo, Hawaii, was considered a separate voyage which gave to either the seaman or the Company the right to terminate.

The "Charles S. Jones", with Fish as one of the seamen on board, left San Pedro on September 27, 1958. On October 2, 1958, Fish complained of a toothache and earache. The Captain testified that he recommended aspirin which he did not remember whether Fish took either orally or for application on the aching tooth. Upon the ship's arrival at Honolulu, on October 4, 1958, Fish was admitted as an out-patient at the United States Public Health Service Out-Patient Clinic. On October 20, 1958, the United States Public Health Service in Honolulu declared him fit for duty and he was transported by airplane to San Pedro, with the direction to report for examination at the United States Public

1. 46 U.S.C.A. § 688. See, Pacific Steamship Company v. Peterson, 1928, 278 U.S. 130, 137–138, 49 S.Ct. 75, 73 L.Ed. 220.

2. Garrett v. Moore-McCormack Co., Inc., 1942, 317 U.S. 239, 240, Footnote 2, 63 S.Ct. 246, 87 L.Ed. 239. And see, Pacific Steamship Company v. Peterson, supra Note 1, 278 U.S. at page 138, 49 S.Ct. at page 77; Bainbridge v. Merchants' & Miners' Transportation Co., 1932, 287

U.S. 278, 282, 53 S.Ct. 159, 77 L.Ed. 302; Lauritzen v. Larsen, 1953, 345 U.S. 571, 574, 73 S.Ct. 921, 97 L.Ed. 1254; Romero v. International Terminal Operating Co., 1959, 358 U.S. 354, 381, 79 S.Ct. 468, 3 L.Ed.2d 368.

3. 28 U.S.C.A. §§ 1333, 1916; Williams v. Tide Water Associated Oil Company, 9 Cir., 1955, 227 F.2d 791.

Health Service at Los Angeles upon arrival. He was thereafter examined at the Public Health Service at Los Angeles who referred him to the United States Public Health Service Hospital at San Francisco for a general checkup. He remained in the hospital, as an in-patient, from November 13, 1958 to December 10, 1958. Other facts relating to his examinations and hospitalization will be referred to later on in the discussion.

We dispose of the claim of negligence by stating that at the conclusion of plaintiff's case his counsel admitted that no negligence in treatment had been shown as had been alleged in the Complaint. As recovery under the Jones Act is dependent on negligence,[4] and none was proved, Fish is clearly not entitled to recover on that claim.

## II

### Maintenance and Cure

■ It is Richfield's contention that because they paid Fish's maintenance while an out-patient at Honolulu and repatriated him at their own expense, they have no further obligation towards him. This contention requires a brief statement of the obligation which a shipowner owes to a seaman whose employment is terminated by illness. Generally, when this is the cause of the termination of the employment the seaman is entitled to wages, maintenance and cure for the length of the voyage or employment.[5] The idea is to "make the seaman whole" so that he will lose nothing by reason of his illness. If his illness is of long duration he might be entitled to maintenance and cure beyond the term of his employment.[6]

■ In the light of the principles just stated, it is quite evident that Fish is entitled to maintenance, cure and wages for the periods hereinafter stated. A review of the lengthy Public Health record leads to the conclusion that between October 4, 1958 and January 3, 1959, Fish was incapacitated for a total period of 43 days.

Fish had undergone an operation for a radical mastoidectomy in 1955. When examined by Richfield's physician prior to his employment he admitted this operation as well as a preceding case of shingles. He failed to reveal two nervous breakdowns which appear later on in the history given at his various examinations. It is undenied that during his examinations at Honolulu his condition was diagnosed as labyrinthitis. While upon his being declared fit for duty in Honolulu the condition was declared "to be resolved" he was told to check it when he arrived in Los Angeles. At Los Angeles he was found to suffer from this and other possible ailments and was referred to the Public Health Service Hospital at San Francisco where he remained as an in-patient for over thirty days.

If we try to evaluate, *separately and segmentally,* some of these incidents and some of his complaints we would do Fish an injustice. Presumably he has a low tolerance for pain and some of his complaints may have been psychosomatic. But the physician in charge at the Los Angeles Public Health Service facility who testified in court, Dr. Arthur R. Dahlgren, who has the title of Senior Surgeon, Deputy Medical Officer in charge, testified that there was no element of malingering in the case and that, in his opinion, the illness which seized

4. See references in Notes 1 and 2.

5. The Osceola, 1903, 189 U.S. 158, 175, 23 S.Ct. 483, 47 L.Ed. 760; Farrell v. United States, 1949, 336 U.S. 511, 513–520, 69 S.Ct. 707, 93 L.Ed. 850; Pacific Mail S.S. Co. v. Lucas, 9 Cir., 1920, 264 F. 938, 941; Luksich v. Misetich, 9 Cir., 1944, 140 F.2d 812, 813; McManus v. Marine Transport Lines, Inc., 2 Cir., 1945, 149 F.2d 969, 970. And see the writer's opinions in Clifford v. The Iliam-

na, D.C.Cal.1952, 106 F.Supp. 36; Wills v. Keystone Tankship Corp., D.C.Cal. 1952, 109 F.Supp. 650, and Judge Mathes' opinion in Vitco v. Joncich, D.C.Cal.1955, 130 F.Supp. 945, 948–949.

6. Farrell v. United States, supra Note 5; Enochasson v. Freeport Sulphur Co., D.C. Tex.1925, 7 F.2d 674, 675–676; Rofer v. Head & Head, Inc., 5 Cir., 1955, 226 F. 2d 927, 929; Peterson v. United States, 9 Cir., 1955, 224 F.2d 748, 751.

Fish while on the voyage to Honolulu was "a form of labyrinthitis" and that "it was recurring."

A study of the record forces me to concur in this conclusion. And the fact that, at various interim stages, examining physicians may have marked the condition as "resolved", did not prevent its subsequent recurrence. Indeed, there is a notation in his record at San Francisco, under the date of November 13, 1958, that his old left ear problem was "recurrent labyrinthitis". In the light of these facts I am of the view that he was actually incapacitated for two periods, one of twenty days and one of twenty-three days, and that the condition appeared while "in the ship's service". Fish is, therefore, entitled to maintenance at the standard rate of $8 per day, or a total of $344.

## III

### The Problem of Wages and Overtime

 The question of wages and overtime presents a problem that is not so clear. Concededly, where the employment is for a voyage or a definite period the maximum of recovery, if a seaman is incapacitated, would be the loss of wages for the voyage or the period of employment.[7] Where the articles are of

---

7. See cases cited in Note 5. And see, Dobbs v. Lykes Bros. Steamship Company, Inc., 5 Cir., 1957, 243 F.2d 55, 57–58. There is nothing in Loverich v. Warner Co., 3 Cir., 1941, 118 F.2d 690 contrary to the law as herein stated and which is fully supported by the cases given in Note 5. A paragraph taken out of context might give the impression that the court intimated that an employer *was not* liable if the ailment was a *recurrence* of a prior ailment. The court,—although using *arguendo*, the language which counsel for Richfield have quoted in their brief,—allowed recovery, as will appear from the following quotation which follows the court's reference to Calmar Steamship Corp. v. Taylor, 1938, 303 U.S. 525, 58 S.Ct. 651, 82 L. Ed. 993,

> "It is clear that the right of such maintenance *is not restricted to those cases where the seaman's employment is the cause of the illness*. It is now clear, also, that the obligation may *continue* after the termination of the voyage in which an injury is sustained or an illness begins. Those points are definitely settled by the decisions in the Calmar litigation. * * "What difference should it make in libellant's case because following the termination of his employment with respondent he worked successively for two other employers, assuming that during such period he was suffering from the *disease originating during* his employment by the respondent? Upon this point we find no help in the authorities. We believe, however, that while this is something of an extension of the liability imposed under the rule of the Calmar case, it is

justified by the fundamental principles upon which the obligation for maintenance and cure is bottomed. It is to be noted that this man did not voluntarily leave the respondent's employment. He was dismissed on a recommendation of the company's physician who advised the company that he was a poor risk. The physician admitted on cross-examination that upon his examination of the libellant he thought he had syphilis or cancer from the chronic laryngitis. There is no evidence of syphilis. No examination was made to ascertain whether cancer was present and the man was turned out. (If he was already suffering from cancer in one of its developing stages he could hardly look to subsequent employers for the performance of this obligation.) *We do not see how his own self-reliance in keeping going as long as he could should preclude his recovery against this respondent.*" (Loverich v. Warner Co., supra, 118 F.2d at pages 692, 693) (Emphasis added.)

The court in the penultimate paragraph which we have placed in parenthesis was merely speculating on the effect of an intermediate employment on the right to recovery for an illness which manifested itself for the first time years before. But it sanctioned recovery for a recurring antecedent illness as the italicised portions of the quotation show. In this respect, the decision accords with the rule obtaining in this and other circuits that aggravation of a pre-existing disease occurring while "in the service of" an employer is compensable. See the writer's opinion in Trudenich v. Marshall,

this character no difficulty is presented. Where, as here, the shipping articles are open articles in coastal trade, the problem must be solved by reference to general principles. And I believe that the correct solution is that indicated in one of the cases cited which limits recovery to the wage-payment period.[8]

■ As Fish's wages were paid monthly and the employment could be terminated at the end of any of the voyages, far short of a monthly period, the period of one month is fair and equitable to adopt. It accords with the principle which obtains generally in the law of contracts of employment that where no definite term is fixed, the periodic compensation, whether by the week or by the month, may be used to determine the duration of the employment.[9] So, in this case I am of the view that while the contract was terminable by Fish or Richfield at the end of a voyage that could have lasted less than a month, the contract was, *in reality, a month to month contract terminable by either side at the end of any of the short voyages.*

In applying this principle, I find that as the termination was caused by Fish's illness, manifested while in the ship's service, he is entitled to recover his loss of wages for a period of one month, to wit $342.

■■ A brief comment on overtime. In a prior case, already cited,[10] I allowed *estimated overtime.* It does not appear that the allowance was contested. However, I believe that in a case of the character of the case before us here, in which the shipping articles do not call for a definite voyage or period of employment and the seaman is incapacitated by illness, and he has been allowed full maintenance and wages, that the recovery should not be increased by the allowance of *possible* lost overtime. This for the reason that the period for which wage recovery has been allowed is so much longer than a single voyage would have been, had there been termination for other causes, and the recovery allowed is an in lieu recovery for a longer priod than the actual contractual employment might have been. More, as the ship carried more than a full complement of crew, computation of overtime that might have been earned is too speculative and uncertain, *as there was little likelihood of earning overtime.*

## IV

### No Fraud Exists

■■■■ The defendant in its Answer has pleaded that when Fish was given his pre-employment physical examination he did not disclose the fact that he had had

D.C.Wash.1940, 34 F.Supp. 486, 488–490. And see, United States v. Fotopulos, 9 Cir., 1950, 180 F.2d 631, 640.

8. Rofer v. Head & Head, Inc., supra Note 6. Cf. Mason v. Evanisevich, 9 Cir., 1942, 131 F.2d 858, 859; The Betsy Ross, 9 Cir., 1944, 145 F.2d 688, 689. Shipping articles for coasting trade are prescribed by 46 U.S.C.A. § 574. Once signed they are deemed automatically renewed at the beginning of every subsequent trip. Peninsular & Occidental S.S. Co. v. National Labor Relations Board, 5 Cir., 1938, 98 F.2d 411, 414. Section 596 of the same Title makes it mandatory to pay wages in intercoastal trade "within two days after the termination of the agreement under which he (the seaman) was shipped." Penalties attach if wages are not so paid or delayed "without sufficient cause". See, Glandzis v. Callinicos, 2

Cir., 1944, 140 F.2d 111, 114–115; Rodriguez v. Gerontas Compania De Navegacion, D.C.N.Y.1957, 150 F.Supp. 715, 723.

9. Shuler v. Corl, 1918, 39 Cal.App. 195, 197–198, 178 P. 535; Standing v. Morosco, 1919, 43 Cal.App. 244, 247, 184 P. 954; Ilse v. Burgess, 1938, 28 Cal.App.2d 654, 657, 83 P.2d 527. This is embodied in statutory form in California. California Labor Code, § 3002. It is also the general rule. 56 C.J.S. Master and Servant § 8, subd. b, pp. 76, 77; 35 Am.Jur., Master and Servant, §§ 20–21. And see the writer's opinion in United States v. Richfield Oil Corp., D.C.Cal.1951, 99 F.Supp. 280, at pages 289–290, in which a lease for no specified term was interpreted as "a month to month lease" because the rent was paid monthly. And see, Smith v. Royal Ins., Ltd., 9 Cir., 1940, 111 F. 2d 667, 670–671, 130 A.L.R. 812.

10. Clifford v. The Iliamna, supra Note 5.

two nervous breakdowns. The examining physician testified that under Richfield's rules Fish would not have been certified for employment if those illnesses had been disclosed. I am not ready to apply to seamen's contracts of employment the rigid rule which invalidates contracts for life insurance when there is concealment of a serious illness.[11] And under the facts in this case it would not be equitable to do so. As the cause of the disability which forced Fish to leave the ship is not related to any nervous breakdown, but concerns an illness *which he fully disclosed,* the representation *was not* material. There can be no fraud unless the representation relates to a material matter.[12] And, as the express duration of the term of employment did not exceed one month and was terminable at the end of any voyage of shorter duration by Fish or Richfield, means

were at hand to terminate it the moment a mental breakdown appeared. So Richfield was not harmed by the concealment and should not be allowed to avoid the slight burden here found.

Were we to sanction Richfield's contention, we would be reading into the shipping articles a warranty of good health that would turn a failure to disclose a previous ailment, which *did not* result in the subsequent disability, as a breach of warranty by the seaman that, as Richfield's Answer states

"he was and would continue to be well and sound of mind and body". (Answer, p. 5, lines 6 and 7)

To sanction such release from liability would go counter to the historically liberal spirit of admiralty in dealing with the rights of seamen and in interpreting their contracts.[13] It would also be an un-

---

11. Byrnes v. Mutual Life Insurance Company of New York, 9 Cir., 1954, 217 F. 2d 497.

12. Restatement, Contracts, §§ 470–471, 474. See the writer's opinion in Pinney & Topliff v. Chrysler, D.C.Cal., 176 F. Supp. 801, and cases cited in Note 12 of that opinion. See, Ahmed v. United States, 2 Cir., 1949, 177 F.2d 898, 899, which distinguishes very cogently Tawada v. United States, 9 Cir., 1947, 162 F.2d 615, 617, in which there was actual concealment of an existing "disabling disease". And see, Perez v. Suwanee Steamship Co., 2 Cir., 1956, 239 F.2d 180; Couts v. Erickson, 5 Cir., 1957, 241 F.2d 499, 502–504.

13. While, through organization and prospective legislation, seamen have mitigated many of the hardships of their calling, they are still considered.
"the wards of the admiralty, whose traditional policy it has been to avoid, within reasonable limits, the application of rules of the common law which would affect them harshly because of the special circumstances attending their calling." Socony-Vacuum Oil Co. v. Smith, 1938, 305 U.S. 424, 431, 59 S.Ct. 262, 266, 83 L.Ed. 265. Courts, even today, go back to the view expressed by Mr. Justice Story, in 1823, when they speak
"of the solicitude with which admiralty has traditionally viewed seamen's contracts." See, Garrett v. Moore-

McCormack, supra Note 2, 317 U.S. at page 246, 63 S.Ct. at page 251.
Mr. Justice Story's classic language referred to is well known:
"They are emphatically the wards of the admiralty; and though not technically incapable of entering into a valid contract, they are treated in the same manner, as courts of equity are accustomed to treat young heirs, dealing with their expectancies, wards with their guardians, and cestuis que trust with their trustees. They are considered as placed under the dominion and influence of men, who have naturally acquired a mastery over them; and as they have little of the foresight and caution belonging to persons trained in other pursuits of life, the most rigid scrutiny is instituted into the terms of every contract, in which they engage. If there is any undue inequality in the terms, any disproportion in the bargain, any sacrifice of rights on one side which are not compensated by extraordinary benefits on the other, the judicial interpretation of the transaction, is that the bargain is unjust and unreasonable, that advantage has been taken of the situation of the weaker party, and that pro tanto the bargain ought to be set aside as inequitable. Hence *every deviation from the terms of the terms of the common shipping paper,* (which stands upon the general doctrines of maritime law,) *is rigidly*

757

warranted addition to the terms of the shipping articles.[14]

### Conclusion

Judgment will, therefore, be that Fish take nothing by his first cause of action, based on negligence, but that he recover under his second and third causes of action for wages, maintenance and cure in the total amount of $686.00. Findings and judgment to be prepared by counsel for the plaintiff under Local Rule 7, West's Ann.Code.

inspected; *and if additional burthens or sacrifices are imposed upon the seamen without adequate remuneration, the court feels itself authorised to interfere* and moderate or annul the stipulation." Harden v. Gordon, 1823, 11 Fed.Cas. pages 480, 485, No. 6,047 (Emphasis added.)

14. "The articles, when in doubt, are most strongly construed against the ship".

The Thomas Tracy, 2 Cir., 1928, 24 F.2d 372, 374.
Here the articles are silent on the subject. So there is stronger reason for not reading into them a clause that would diminish the seaman's rights and would have the effect of a "release in advance". See, Garrett v. Moore-McCormack Co., supra Note 2, 317 U.S. at page 248, 63 S.Ct. at page 252, and other cases cited in Note 2.