Carter MYERS, Plaintiff, Appellant,

v.

ISTHMIAN LINES, INC., Defendant,
Appellee.

No. 5603.

United States Court of Appeals
First Circuit.

Sept. 8, 1960.

Nathan Greenberg, Boston, Mass., for appellant.

Robert J. Hallisey, Boston, Mass., with whom Seymour P. Edgerton, W. C. Moffett, Hiller B. Zobel and Bingham, Dana & Gould, Boston, Mass., were on the brief, for appellee.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

ALDRICH, Circuit Judge.

This is an appeal by the plaintiff from a judgment of the United States District Court for the District of Massachusetts, following a jury verdict for the defendant on counts for negligence and unseaworthiness and a court finding for the plaintiff on a count for maintenance and cure. The court also dismissed a counterclaim, from which there has been no appeal.

Plaintiff-appellant, Carter Myers, a 24-year-old seaman and member of the crew of the vessel Wellesley Victory, sued defendant-appellee, Isthmian Lines, Inc., the owner of that vessel, (1) under the Jones Act, 46 U.S.C.A. § 688, for injuries allegedly suffered by plaintiff due to defendant's negligence in not furnishing a seaworthy vessel with reasonably safe and proper appliances and providing a reasonably safe place to work, (2) under the general maritime law for injuries caused by the defendant's failure to provide a seaworthy vessel, (3) under the general maritime law for maintenance and cure. At the trial the evidence showed that the vessel carried a deck cargo of locomotives which were lashed in place by chains running thwartships from padeyes on the deck to points on the locomotives about three feet up. In order to pass by a locomotive it was necessary to step over the chains, although it did not appear at what particular height. Special lighting was installed so that the chains would be visible at night. On April 11, 1958, when the vessel was at anchor for repairs in Suez Bay, the plaintiff, while carrying three shackles weighing 10–15 pounds, tripped on a chain and was injured. It was midmorning, the weather was fair and the sea calm. By his own admission the plaintiff had crossed over these chains more than a hundred times. He offered no explanation for catching his foot on this occasion, but merely said that he had done so in spite of "watching." The defendant admitted the presence of the chains, but denied that they caused the deck to be unsafe, and disputed the occurrence of the accident.

Plaintiff alleges eight exceptions. We regard the principal one, apart from maintenance and cure, to be the failure of the court to charge separately on negligence and unseaworthiness. Plaintiff contends that the scope of liability differs, and that his claims are "cumulative,"[1] and that, accordingly, each was entitled to separate consideration. However, what plaintiff is entitled to is consideration of the issues, and if, in a particular case, they are the same, the court is not obliged to charge twice. Cf. Blankenship v. Ellerman's Wilson Line New York, Inc., 4 Cir., 1959, 265 F.2d 455. Plaintiff's basic com-

---

1. We assume plaintiff means by this term merely that he did not have to elect one or the other remedy to be sent to the jury. Obviously he could not recover damages twice for the same injury simply because he had two legal theories. See Baltimore S.S. Co. v. Phillips, 1927, 274 U.S. 316, 321, 47 S.Ct. 600, 71 L.Ed. 1069; McCarthy v. American Eastern Corp., 3 Cir., 1949, 175 F.2d 724, 727, certiorari denied 338 U.S. 868, 70 S.Ct. 144, 94 L.Ed. 532 rehearing denied, 338 U.S. 939, 70 S.Ct. 343, 94 L.Ed. 579.

plaint here was that he was not furnished with a reasonably safe place to work. A place may be unsafe due to some latent defect, as, for example, defective equipment not reasonably discoverable. On the other hand, the place may be unsafe because of some obvious, patent circumstances. In such event the defendant is negligent for establishing or condoning the conditions which made it unsafe and, consequently, made the ship unseaworthy. That was the situation here. The chains were knowingly placed by the defendant. Either they made the vessel insufficiently safe, or they did not. Correspondingly, the defendant was liable for negligence *and* unseaworthiness, or for neither.

■ The court charged the jury, "The defendant is not liable for anything unless you can say that it was negligent, or that the boat was unseaworthy, as I have said. They both refer to the same thing so I am going to use the word 'negligence' so as not to confuse you. * * * Negligence is just exactly what it means. It is legally defined as the failure to discharge the duty owed to another. * * * The laws says that [the defendant] owed him a duty to give him a reasonably safe place to work and with reasonably safe tools and appliances." Then, after charging on other matters, it concluded that the question was, "did they take reasonable precautions toward the men who were about the ship."

It might have been better if, in equating the two, the court had charged in terms of unseaworthiness rather than negligence. Cf. Blankenship v. Ellerman's Wilson Line New York, Inc., supra. But we feel that the charge made plain that furnishing a reasonably safe place to work was the defendant's duty, and that to "take reasonable precautions," in context, meant to furnish a reasonably safe place. There was no statement in the charge that the defendant could escape by showing subjective due care even though the place furnished was in fact unsafe. Nor was any such contention made by the defendant. The defendant in its argument to the jury freely conceded that it had an absolute duty to furnish a reasonably safe place to work, and made no suggestion that it should be excused if it had reasonably tried, but failed. We find no basis for ambiguity.[2] Accordingly, the finding of the jury must be taken to mean, either that the accident did not occur as alleged, or that the deck was reasonably safe when and where the plaintiff was injured. Such a finding disposes of both unseaworthiness and negligence.

■ The plaintiff complains of a reference in the charge to his "assumption of risk." Again, it might have been better if this phrase had not been used. Tiller v. Atlantic Coast Line R.R., 1943, 318 U.S. 54, 68, 63 S.Ct. 444, 87 L.Ed. 610 (concurring opinion); Klimaszewski v. Pacific-Atlantic S.S. Co., 3 Cir., 1957,

2. It is suggested that the jury's request for further instructions indicates it gave a different interpretation to "reasonable precautions." It asked, "When the cargo was inspected by the Maritime before the departure was this inspection for the benefit of the cargo or personnel or both?" Upon the court's stating that the jury must itself recall the evidence, a juror made the following comment. "Your Honor, I think behind this is the question, perhaps, of the attachment of this inspecting group. Is it a Government inspection group or is it an insurance group?" This last may mean that the jury was really concerning itself only with the perennial question of whether

there was insurance. But assuming that the question had a further significance, we do not think that it reflected concern over subjective care. No one had ever suggested that the making of this inspection satisfied the defendant's duty. We see a different thrust to the jury's inquiry. The defendant had produced two experts on the matter of safety, both of whom had testified that the deck was reasonably safe without a catwalk. Both witnesses, however, were defendant's employees. The jury may well have wished to know whether some disinterested expert who had seen the premises beforehand had regarded them as safe.

246 F.2d 875, 877; Texas and P. Ry. v. Buckles, 5 Cir., 1956, 232 F.2d 257, 261–262, certiorari denied, 351 U.S. 984, 76 S.Ct. 1052, 100 L.Ed. 1498. But we believe these words are, for historical reasons, more confusing to lawyers than to laymen. What the court said was this.

"When these two parties met, and the plaintiff probably sought employment, he knew the type of ship he was going to work on. He knew what the work of a seaman or sailor was on a passenger freighter, and while he hadn't assumed the risk that the company would be negligent, he did assume the risk of all the obvious and well-known dangers of his occupation in the same way as [a] pilot in an airplane assumes the risks that are incidental to the normal passenger flight. Understand, I am not saying negligence, I am saying normal flight.

"Now, since negligence is a failure to discharge a duty owed, let's see what the duty was that the defendant owed him, owed the plaintiff. The law says that it owed him a duty to give him a reasonably safe place to work and with reasonably safe tools and appliances."

To a lawyer assumption of risk conjures up ancient doctrine which precluded employees from recovery, in spite of their employer's negligence, if they knowingly worked in an unsafe place. But as used in this charge it contained no such connotation. On the contrary, the court said that a safe place had to be provided. All the charge amounted to was a manner of saying that a seaman who goes to sea in a freighter should expect and is entitled to a reasonably safe place to work judged by normal, necessary freighter conditions, and not, to employ the analogy used by defendant in its argument, the same conditions that would be expected by a passenger dressed in a white suit. See Doucette v. Vincent,

1 Cir., 1952, 194 F.2d 834, 837. But the court made it entirely clear that plaintiff did not assume the risk of negligence, or of an unsafe place.

One final matter relating to the negligence and unseaworthiness claims requires comment. During the trial the plaintiff testified that a wooden catwalk could be erected over temporary obstructions such as chains so as to provide a safe place to walk. The defendant's captain, on the other hand, testified that because of the location of the chains a catwalk would actually create a hazard. The plaintiff called a witness, one Cole, who testified he had thirty-two years experience as a seaman on deck on all kinds of vessels, including those with deck cargoes of locomotives, trains, and box cars. The plaintiff offered to prove through him that there was a custom and practice of erecting catwalks on merchant vessels in such cases. The court excluded this testimony. It is not altogether clear on what basis it did so. To prove custom, as distinguished from safety, Cole did not have to be qualified as an expert witness. Custom is simply a matter of factual observation. Napolitano v. Eastern Motor Express, Inc., 3 Cir., 1957, 246 F.2d 249, 252–253. Nevertheless, though the evidence was admissible to show custom, it might have been taken by the jury as establishing lack of safety. There was no suggestion that Cole was qualified to give an opinion on that issue. Obviously, the need of a catwalk may depend upon the situation at the moment. Safety might have demanded that the defendant's vessel be furnished with a catwalk if and when it was necessary to cross over the chains in heavy weather at sea, but not, as in this case, when the ship was at anchor in a quiet harbor.[3] The question is whether the vessel was unseaworthy when the plaintiff was injured. The court may well have felt that evidence of general custom and

3. The record shows the plaintiff sought to make this very confusion, arguing to the jury that the defendant in effect admitted the deck was unsafe because it placed lights there at night, and "what if a wave comes over * * * and it is a rough sea?"

practice, as distinguished from a description of the purposes of a catwalk, would confuse the issue more than it would help. For this reason we think it was within the court's discretion not to admit it.

The court found that defendant's obligation to pay maintenance and cure terminated June 1, 1959. Plaintiff appeals, pointing out that he continued after that date to visit the outpatient department of the Marine Hospital. Such visits are not conclusive that maximum cure has not been effected. They may mean only that a claimant is in his lawyer's care, rather than in a doctor's. However, we observe that in this case defendant's own expert, who had examined plaintiff professionally on May 22, 1959, indicated that further treatment might be in order. While this doctor testified that plaintiff had "a pretty satisfactory result from the disc surgery," he stated,

> "I advised, strictly from a medical standpoint, [his litigation] be settled promptly. I thought that should be gotten off his chest, from a medical standpoint only. In addition, I recommended he be firmly reassured he was not disabled and that, if necessary, physical therapy and other measures were available, not the least of which I suggested would be psychotherapy or talking sympathetically with this chap and trying to rehabilitate him. I believed that if he were encouraged and managed appropriately and sympathetically I could see no reason why he should not be perfectly well * * *"

This diagnosis might have been the basis of liability for future medical treatment, if there had been charges for any. In our view, however, liability for maintenance, as distinguished from cure, may be a separate question. Cf.

Rofer v. Head & Head, Inc., 5 Cir., 1955, 226 F.2d 927, 930–931. The whole matter of cut-off must be determined by considerations of reasonableness. See, e. g., Farrell v. United States, 1949, 336 U.S. 511, 519, 69 S.Ct. 707, 93 L.Ed. 850; Brahms v. Moore-McCormack Lines, Inc., D.C.S.D.N.Y.1955, 133 F. Supp. 283, 287. That there may be occasional and incidental medical treatment needed to consummate plaintiff's maximum cure should not necessarily make the defendant liable for maintenance expenses, not directly related to that treatment, during the last, lingering stage of final, although minor, improvement. Defendant's liability for maintenance must terminate when the phase of primary treatment has brought plaintiff substantially to his end result, whether that point is measured by complete recovery or simply the maximum recovery he will ever attain.[4] We cannot say that the fact that plaintiff made a few visits to the outpatient department in the summer, for undisclosed purposes, made the court's finding that maintenance should terminate on June 1st plainly erroneous.

Judgment will be entered affirming the judgment of the District Court.

HARTIGAN, Circuit Judge (dissenting).

I do not agree with my colleagues that the district court should be affirmed.

In my opinion the record indicates that the charge given on defendant's duty to the plaintiff could be, and very likely was, misapprehended by the jury. Because of the district court's decision to combine the theories of negligence and unseaworthiness the plaintiff was entitled to a charge on negligence which would spell out an absolute duty on defendant to furnish plaintiff a safe place to work. Although the charge given did state that defendant's duty was to

---

4. This does not conflict with the dictum in the Farrell case relating to newly-discovered possibilities of further improvement. Of course if it develops in the future that much greater recovery is possible, the maintenance expenses necessary to utilize that treatment could be the basis for additional liability at that time.

provide a reasonably safe place for plaintiff to work, the district judge's concluding statement of the law on the duty owed plaintiff was: "[D]id they [the owners of the vessel] take the normal, ordinary precautions to insure the safe arrival of that cargo, and also, did they take reasonable precautions toward the men who were about the ship. If they did, that is all they owed him."

The term "precautions" introduces an element of fulfillment of the duty of a vessel owner by means other than providing a reasonably safe place to work. This element is given greater prominence by reason of its position at the end of the charge. The last statement of the court to the jury is very often the best remembered and it is likely to be the most influential. I believe that this ambiguity as to defendant's duty is prejudicial error.

There is evidence in the record from which one might conclude reasonably that the jury was concerned in its deliberations with "precautions" taken for the safety of the seamen. Midway through its deliberations the jury submitted to the judge the question: "When the cargo was inspected by the Maritime before the departure was this inspection for the benefit of the cargo or the personnel or both?" One juror stated to the court: "I think behind this is the question, perhaps, of the attachment of this inspecting group. Is it a Government inspection group or is it an insurance group?"

My colleagues suggest that, if this inquiry seeks to ascertain anything more than the existence of insurance,[1] it seeks to find out if an independent expert inspecting on behalf of the seamen had seen the deck as loaded and regarded it as safe. This, of course, is one possible explanation of the jury's question. But that question may also indicate that the jury's main concern was with the fact of an inspection on behalf of the seamen's safety, i. e., a precaution for their safety.[2] Under circumstances of an ambiguous statement of defendant's duty and the indication of possible misconstruction by the jury, I believe that plaintiff is entitled to a new trial and clearer instructions on the nature of defendant's duty.

The district court awarded maintenance and cure only until June 1, 1959. My colleagues acknowledge that the testimony of defendant's own witness would support liability for further medical treatment, if there had been charges for such treatment. This apparently means that, in their opinion, the testimony indicates plaintiff on May 22, 1959 had not yet been so far cured as possible. Nevertheless, they affirm the district court's award on the basis that maintenance may be a separate matter and that there must be reasonable bounds to awards for maintenance and cure. The normal duration of liability for maintenance is the same as that for cure. Gilmore and Black, Admiralty, pp. 267–68 (1957). Although in various circumstances maintenance may be a separate question from expenses of medical treatment, e. g., convalescence or free medical care, the traditional role of maintenance has been as an incident to medical cure. Where further medical treatment is indicated, and is within the bounds of reasonableness, I do not believe that maintenance can properly be denied, unless the seaman has no expenditures of this nature. Maintenance can be tailored to fit the

---

1. Reading the two questions together, it would seem that the jury was interested in knowing if the inspection was a safety precaution on behalf of the seamen or only on behalf of the cargo. Existence of insurance doesn't seem to me to be the jury's concern here.

2. Under either interpretation of the jury's question, the jury was concerned with the issue of an inspection on behalf of the seamen's safety, i.e., a precaution for their sake. Whether the jury was concerned with the question of inspection itself or only in connection with an independent opinion of the reasonable safety of the deck is debatable, but the ambiguity of the jury's question is all the more reason to view the charge critically to see if it was sufficiently clear.

actual situation of living expenses incident to the medical cure. Gilmore and Black, Admiralty p. 266. See also Koslusky v. United States, 2 Cir., 1953, 208 F.2d 957. I believe that the district court's cut off date of June 1, 1959 is clearly erroneous and should be reversed.